Billie TACKETT and Truman Tackett, her husband, Plaintiffs Below, Appellants, Cross–Appellees,

v.

STATE FARM FIRE AND CASUALTY INSURANCE COMPANY, Defendant Below, Appellee, Cross–Appellant.

No. 58, 1994.

Supreme Court of Delaware.

Submitted: Nov. 15, 1994.
Decided: Feb. 10, 1995.

Edmund Daniel Lyons, Aerenson, Ferrara & Lyons, Wilmington, for appellants, cross-appellees.

F. Alton Tybout, Tybout, Redfearn, & Pell, Wilmington, for appellee, cross-appellant.

Before VEASEY, C.J., WALSH and HOLLAND, JJ.

WALSH, Justice:

This is an appeal from the Superior Court following a jury verdict in favor of the plaintiffs-below, appellants, Billie Tackett ("Mrs. Tackett") and Truman Tackett, her husband (the "Tacketts"). The Tacketts based their claim on allegations of bad faith in the delayed payment of underinsured motorist coverage under a policy issued by the appellee, State Farm Mutual Fire and Casualty Insurance Company ("State Farm"). The Tacketts claim error in the Superior Court's directed verdict on their claim for intentional infliction of emotional distress and in its refusal to submit to the jury their claim for punitive damages. State Farm has cross-appealed from a pretrial ruling which required State Farm to disclose certain documents in the face of State Farm's assertion of attorney-client privilege and work product.

We conclude that a cause of action for the bad faith delay, or the nonpayment, of an insured's claim in a first-party insured-insurer relationship is cognizable under Delaware law as a breach of contractual obligations. In the absence of accompanying physical injury, however, there can be no recovery for emotional distress. While punitive damages may be recoverable for an intentional or malicious breach of a contract of insurance, the Superior Court correctly determined, as a matter of law, that such recovery was not warranted in this case.

With respect to State Farm's cross-appeal, we affirm the Superior Court's order requiring production of materials allegedly protected by the attorney-client privilege on the basis of waiver. We do not endorse the Superior Court's analysis in rejecting State Farm's work product assertion, but conclude that this material is equally subject to production under the circumstances of this case. Accordingly, we deny the cross-appeal as well.

I

In May, 1984, Billie Tackett was injured in an automobile accident caused by another driver's negligence. In settlement of her claim against the driver, Mrs. Tackett accepted $25,000, the policy limits, from the tortfeasor's liability insurer. Because she believed that the amount received did not fully compensate her for her injuries, she initiated a claim against State Farm for recovery under an uninsured/underinsured motorist coverage provision of her own policy. Initially, there was some dispute as to the amount of such coverage. After the Tacketts commenced litigation, however, State Farm agreed to reform its underinsured coverage to provide limits of $50,000 per person/$100,000 per accident on the policy.

On November 7, 1986, the Tacketts' counsel presented a demand to State Farm for the full $50,000 of underinsured coverage to settle Mrs. Tackett's claim for her injuries, as well as her husband's loss of consortium claim. The demand from the Tacketts' counsel presented proof that, disregarding future medical expenses or pain and suffering, Mrs.

Tackett would be unable to pursue her previous employment and would suffer a wage loss of more than $110,000 by the time she reached retirement age.

In an internal evaluation report dated November 17, 1986, Linda Walters, a State Farm Claims Representative, evaluated the Tacketts' demand and the supporting documentation. She concluded that, with additional supporting documentation, the claim had a value of $45,000 to $50,000. The claim superintendent, Rick Walls ("Walls"), therefore, placed a $50,000 reserve on the claim, but ordered an independent medical examination because of a suspicion that a prior accident contributed to Mrs. Tackett's condition. This examination was ordered despite the earlier advice of State Farm's outside counsel, F. Alton Tybout ("Tybout"), who reported "that there is not much more that can be done in the taking of additional discovery. The possible benefit of an independent medical examination is questionable." On November 18, Tybout had advised Walters that "the arbitrator would probably find the [Tackett's] claim had a value of $50,000 or more even though it has some obvious disabilities."

The independent medical examination sought by State Farm was performed by Dr. Dewey Nelson on January 9, 1987. Dr. Nelson reported to State Farm that Mrs. Tackett "does not have any impressive neurological signs," but that the 1984 accident did activate a prior back condition. State Farm then asked Dr. Nelson to elaborate on his findings. On February 27, 1987, Dr. Nelson advised State Farm that Mrs. Tackett could do some type of gainful employment without heavy lifting, twisting, turning or climbing and could perform "sedentary duties such as receptionist or secretarial activities."

In early March, 1987, State Farm's claim superintendent, Walls, authorized payment of $30,000, with an initial offer of $20,000. The Tacketts' counsel promptly rejected this offer and repeated his demand for the policy limits. In May, 1987, State Farm transferred Walls in the ordinary course of business and a new claim superintendent, W. Travers Rinehardt ("Rinehardt") assumed responsibility for the Tackett claim. After review of sup-porting documentation, Rinehardt concluded that State Farm had undervalued the claim and made a written offer of policy limits on June 12, 1987 to the Tacketts' attorney. The Tacketts eventually agreed to accept this amount, but without prejudice to their filing of a claim for bad faith delay. To that end, the Tacketts filed an amended complaint on August 12, 1987 seeking compensatory and punitive damages.

During the course of pretrial discovery, the Tacketts propounded interrogatories concerning State Farm's claims handling procedures and eventually sought production of the Tacketts' entire claim file. State Farm produced the file, but deleted nine items on the ground that such material was protected by the attorney-client privilege and/or the work product doctrine. The trial court ordered the documents produced for an *in camera* examination and, thereafter, ordered their production. *Tackett v. State Farm Fire and Casualty,* Del.Super., 558 A.2d 1098 (1988). It is this ruling which is the subject of State Farm's cross-appeal.

The Tacketts' bad faith claim proceeded to trial. The Tacketts argued at trial that State Farm's actions were taken in pursuit of a "Get Tough" policy which the company had established to limit what it viewed as an increase in bodily injury claims, including uninsured and underinsured motorist claims. State Farm contended that any delay in the payment of the Tacketts' claim was attributable to a failure by the Tacketts to furnish timely, supporting information and its belief that Mrs. Tackett's pre-accident physical condition contributed to her injuries. During the course of trial, the Superior Court ruled that Mrs. Tackett could not present evidence of, or recover damages for, emotional distress in the absence of proof of accompanying physical injury. Upon State Farm's motion, the trial court also barred recovery for punitive damages. The court ruled, as a matter of law, that punitive damages were not recoverable in a breach of contract action in which there was no showing of intentional or malicious conduct.

The jury was instructed that, if it were persuaded that State Farm had delayed payment of the Tacketts' claim in bad faith, it

could award compensatory damages in the form of legal interest on the policy limits eventually tendered by State Farm. The jury returned a verdict for the Tacketts in the sum of $3,062.50. The Tacketts have appealed from the trial court's rulings which restricted the scope of recoverable damages.

## II

Although the Superior Court's ruling on State Farm's attorney-client and work product claim is the subject of a cross-appeal, we will examine that ruling at the outset because, sequentially, it preceded the rulings at trial. Moreover, in the event the trial court erred in not upholding the assertions of privilege and immunity, documents subsequently produced should not have been available for the plaintiffs' use at trial, possibly invalidating that result.

■ This Court exercises *de novo* review on the question of whether a trial court correctly applied the attorney-client privilege, *Citadel Holding Corp. v. Roven*, Del. Supr., 603 A.2d 818, 825 (1992), and the work product doctrine. There is no factual dispute concerning the authenticity of the disputed documents and both parties agree that, *prima facie*, the documents were protected by the attorney-client privilege. The dispute centers on whether, as the Superior Court ruled, State Farm waived both its attorney-client privilege and its work product defense.

As previously noted, the question of protected documents arose in pretrial discovery. In paragraph 43 of their amended complaint, the Tacketts alleged:

> The failure or refusal of State Farm to pay Plaintiffs' claim for the full $50,000.00 in benefits on the Underinsured Motorist provision of the above referenced policy was willful and deliberate on the part of the Defendant and *without any reasonable justification.* [emphasis added]

State Farm denied this allegation in its answer to the amended complaint, but did not provide any explanation for its denial. The plaintiffs propounded further interrogatories upon State Farm on August 21, 1987. One of these interrogatories read as follows:

> Set forth all facts in support of any claim by State Farm that it had any "reasonable justification" in support of State Farm's decision to not pay Plaintiffs' claim in full, such claim having been presented for Underinsured Motorist benefits under State Farm policy S43–4056–A17–08B.

State Farm answered these interrogatories in October of 1987. This answer stated, in pertinent part, as follows:

> The process by which the decision to make payment in full was reached and the role of various State Farm personnel and the plaintiffs' attorney are contained in an affidavit by W. Travers Rinehardt being filed simultaneously with the answers to these interrogatories. *More detailed facts are contained in the file being produced simultaneously with the answers to these interrogatories. Together they show a reasonable and orderly pattern of claims handling which ultimately and in due course led to the payment of the policy coverage.* [emphasis added]

Rinehardt's affidavit recited:

> Based on my experience of ten years, this claim was handled routinely, without any undue delay, with no bad faith on the part of State Farm Mutual Automobile Insurance Company or its employees. Furthermore, no reason existed to handle this claim unlike any other claim that comes through this office, and based on my experience, State Farm handled this claim as expediently as any other claims office in this local [sic] would have handled a similar claim.

In rejecting State Farm's claim of privilege, the Superior Court did not differentiate between the work product doctrine and the attorney-client privilege, but rather fused them into a single analysis. The court applied a "substantial need" test under Superior Court Civil Rule 26(b)(3) and concluded that the information was unavailable elsewhere. The court also indicated that an insurer defending a bad faith claim cannot advance a defense based on routine handling without permitting examination of documents which demonstrate the internal processing of the claims. Although the trial court did not articulate a waiver rationale in its attorney-

client analysis, we think it implicit in its reliance on cases which applied that concept to bad faith insurance claims. *See e.g., Bourget v. Governmental Employees Ins. Co.,* D.Conn., 48 F.R.D. 29 (1969). In our view, the Superior Court incorrectly mixed the analyses of the attorney-client privilege and the work product doctrine, but we agree with its conclusion that the documents in question were subject to production in this case.

### A.

■ Under Delaware law, the attorney-client privilege is defined in Rule 502 of the Delaware Rules of Evidence. That rule "is consistent with previous Delaware jurisprudence in extending the [attorney-client] privilege to all communications, whether written or oral, made for the purpose of facilitating the rendition of professional legal services." *Zirn v. VLI Corp.,* Del.Supr., 621 A.2d 773, 781 (1993). The privilege belongs to the client, but the client may, expressly or implicitly, waive the protections afforded by the privilege.

■ In the abstract, waiver is viewed as the voluntary and intentional relinquishment of a known right. *Realty Growth Ins. v. Council of Unit Owners,* Del.Supr., 453 A.2d 450, 456 (1982). Nevertheless, waiver of the attorney client privilege may be implicit, even if contrary to the party's actual intent. As Professor Wigmore explains:

> [R]egard must be had to the double elements that are predicated in every waiver, i.e. not only the element of implied intention, but also the element of fairness and consistency. A privileged person would seldom be found to waive, if his intention not to abandon could alone control the situation. There is always also the objective consideration that when his conduct touches a certain point of disclosure, fairness requires that his immunity shall cease whether he intended the result or not.

8 John H. Wigmore, *Evidence in Trials at Common Law* § 2327 (J. McNaughton rev. ed. 1961).

■ In the context of the attorney-client privilege, waiver rests on a rationale of fairness, *i.e.,* disclosure of otherwise privileged information by the client under circumstances where "it would be unfair to deny the other party an opportunity to discover other relevant facts with respect to that subject matter." *Hercules Inc. v. Exxon Corp.,* D.Del., 434 F.Supp. 136, 156 (1977). The courts of this State have refused to allow a party to make bare, factual allegations, the veracity of which are central to resolution of the parties' dispute, and then assert the attorney-client privilege as a barrier to prevent a full understanding of the facts disclosed. *See Friction Div. Products v. E.I. DuPont de Nemours,* D.Del., 117 F.R.D. 535, 538–39 (1987); *International Paper Co. v. Fibreboard Corp.,* D.Del., 63 F.R.D. 88, 92 (1974); *Sealy Mattress Co. of N.J. v. Sealy,* Del.Ch., C.A. No. 8853, slip op. at 14, 1987 WL 12500, Jacobs, V.C. (June 19, 1987) ("As a general matter, a party cannot take a position in litigation and then erect the attorney-client privilege in order to shield itself from discovery by an adverse party who challenges that position.").

■ A party cannot force an insurer to waive the protections of the attorney-client privilege merely by bringing a bad faith claim. *Cf. Hoechst Celanese Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pennsylvania,* Del.Super., 623 A.2d 1118, 1125 (1992). Where, however, an insurer makes factual assertions in defense of a claim which incorporate, expressly or implicitly, the advice and judgment of its counsel, it cannot deny an opposing party "an opportunity to uncover the foundation for those assertions in order to contradict them." *Friction Div. Prods.,* 117 F.R.D. at 538.

■ We conclude that the Tacketts met the exacting standards for a determination that State Farm had implicitly waived the attorney-client privilege. In its answer to the Tacketts' complaint, State Farm denied any unreasonable justification for denying the Tacketts' claim and asserted as an affirmative defense that the Tacketts had failed to supply information necessary for their claim to be processed. While this defense does not directly relate to any protected communications, it does suggest that there was nothing in the routine handling of the claim that contributed to the delay. When

State Farm was required, in the course of discovery, to set forth factors in support of its claim of reasonable justification for non-payment of the claim, it relied upon Rinehardt's affidavit and the claim file which, State Farm asserted, showed "routine handling." This Court has ruled "that the disclosure of even a part of the contents of a privileged communication surrenders the privilege as to those communications." *Citadel*, 603 A.2d at 825. Once State Farm alleged particularized facts that implicitly relied upon communications with counsel contained in the Tacketts' file, the first prong of the waiver analysis was satisfied—disclosure of otherwise protected facts relevant to a particular subject matter relied upon as a defense.

■ Partial disclosure of facts protected by the privilege is not enough, however. Implicit waiver also requires that the partial disclosure place the party seeking discovery at a distinct disadvantage due to an inability to examine the full context of the partially disclosed information. *See Zirn*, 621 A.2d at 782. In the usual situation, the opposing party will have no alternative source for obtaining the concealed information if the privilege is upheld. Disclosure is thus required in order to promote the rationale which underlies waiver: "fairness and discouraging use of the attorney-client privilege as a litigation weapon." *Citadel*, 603 A.2d at 825. Here, once State Farm alleged a routine handling of the Tacketts' claim and suggested that any delay was attributable to inaction on the part of the insured, the Tacketts could challenge those allegations only with a full showing of the facts contained in the claim file. To rule otherwise would permit State Farm to gain the inference that, not only was the claim handled routinely, but the routine analysis of the claim supported the delay in payment. Fairness requires that assertions of fact be tested by disclosure. Without access to the complete file, the Tacketts would be unable to challenge State Farm's assertions and would be forced to accept as true its claim of routine handling.[1]

■ Our ruling does not create a rule of *per se* waiver of the attorney-client privilege in insurance bad faith cases. But where, as here, an insurer makes factual representations which implicitly rely upon legal advice as justification for non-payment of claims, the insurer cannot shield itself from disclosure of the complete advice of counsel relevant to the handling of the claim.

### B.

We next address State Farm's contention that the Superior Court incorrectly applied the work product doctrine in its ruling requiring production of certain portions of the Tacketts' claim file. As previously noted, the Superior Court did not differentiate between the attorney-client privilege and the work product doctrine, but rather fused the two in its analysis. While the Superior Court was required to apply a more stringent standard to the work product assertion to guard against disclosure of the mental impression of counsel, we are satisfied that there was a sufficient showing of a compelling need to meet that exacting standard as revealed by the court's *in camera* inspection. Thus, we view the Superior Court's conclusion regarding production to be the correct result.

■ Waiver of the attorney-client privilege does not automatically relinquish the protection provided by the work product doctrine. *Hercules*, 434 F.Supp. at 156. Unlike the attorney-client privilege, the work product doctrine is intended to protect "the privacy of lawyers in their work and encourag[e] the freedom of lawyers from interference in the task of preparing their clients' cases for trial." *Riggs Nat. Bank of Washington, D.C. v. Zimmer*, Del.Ch., 355 A.2d 709, 715 (1976). Nevertheless, promotion of the adversary system occasionally can conflict with fundamental notions of fairness in litigation. *See United States v. Zolin*, 491 U.S. 554, 569–70, 109 S.Ct. 2619, 2629–30, 105 L.Ed.2d 469 (1989).

---

1. Although disclosure of contrary information cannot provide a *post hoc* justification for waiver, the Tacketts were able to show at trial that State Farm's outside counsel and its claim investigator recommended the payment of policy limits several months before such payment, without the need for further documentation.

The work product doctrine finds its modern articulation in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The Federal Rules of Civil Procedure substantially codified the Supreme Court's findings in *Hickman* in what is now Rule 26(b)(3). Its counterpart in Delaware's Rules of Civil Procedure, patterned after the Federal Rules, provides, in pertinent part, as follows:

> [A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has *substantial need* of the materials in the preparation of the party's case and that the party is unable without *undue hardship* to obtain the *substantial equivalent* of the materials by other means. *In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.*

Super.Ct.Civ.R. 26(b)(3) (emphasis added). "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *United States v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975).

■ The parties do not dispute that the materials sought to be discovered are protected by the work product doctrine. Thus, we assume that the materials were prepared in anticipation of litigation. The Tacketts argue, however, that in certain, unusual circumstances such materials are discoverable. State Farm contends that the mandatory language of Rule 26(b)(3) creates an absolute immunity from production.

The relatively recent development of a cause of action for an insurer's bad faith delay in payment of an insured's claim creates a certain dilemma in the application of Rule 26(b)(3). On the one hand, courts continually seek to provide an atmosphere in which clients may have unfettered communications with counsel, *see Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981), and in which attorneys may freely develop a client's case without undue interference from opposing counsel. *See Hickman*, 329 U.S. at 510–11, 67 S.Ct. at 393–94. On the other hand, a bad faith claim against an insurer cannot be proven without sufficient access to the claim file which frequently contains opinion work product. *See Reavis v. Metropolitan Property and Liability Ins. Co.*, S.D.Cal., 117 F.R.D. 160, 164 (1987). The dilemma has generated significant commentary[2] and a conflict among courts when deciding whether to allow a party to discover opinion work product.

Courts, such as the Fourth Circuit in *Duplan Corp. v. Moulinage et Retordie de Chavanoz*, 4th Cir., 509 F.2d 730, 734 (1974), *cert. denied*, 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975), read Rule 26(b)(3)'s mandatory language as granting absolute immunity to opinion work product.[3] Other courts,

**2.** *See, e.g.,* Andrea L. Borgford, Comment, *The Protected Status of Opinion Work Product: A Misconduct Exception,* 68 Wash.L.Rev. 881 (1993); Randy Papetti, Note, *The Insurer's Duty of Good Faith in the Context of Litigation,* 60 Geo. Wash.L.Rev.1931 (1992); Donna Gooden Payne, Note, *Insurer Bad Faith: The Need for an Exception to the Attorney–Client Privilege,* 11 Rev.Litig. 111 (1991); Jane E. Powell and Ellen L. Lyons, *Alaska Supreme Court Year in Review 1990,* 8 Alaska L.Rev. 71 (1991); Diego Ascencio, *F.S. 624.155 Actions: The Expanding Field of Claimants, Claims and Complexities,* 9 Trial Advoc.Q. 31 (1990); James C. Nielsen, *Advice of Counsel in Insurance Bad Faith Litigation: A Substantive Framework for Pleading, Discovery and Proof,* 25

Tort & Ins.L.J. 533 (1990); Thomas E. Workman, *Plaintiff's Right to the Claim File, Other Claim Files and Related Information: The Ticket to the Gold Mine,* 24 Tort & Ins.L.J. 137 (1988).

**3.** More recent opinions, however, have called the 1974 *Duplan* opinion into question. *See, e.g., Charlotte Motor Speedway, Inc. v. International Ins. Co.*, M.D.N.C., 125 F.R.D. 127, 129–130 (1989) (noting the effect of the Supreme Court's inclination in *Upjohn* to require a "far stronger showing of necessity and unavailability by other means" to compel disclosure of opinion work product).

such as the Ninth Circuit in *Holmgren v. State Farm Mut. Auto. Ins. Co.,* 9th Cir., 976 F.2d 573, 577 (1992), recognize the plaintiff's difficulty in establishing bad faith without access to the entire claims file. We favor the logic of *Holmgren* and, therefore, decline to read the mandatory language of Rule 26(b)(3) as establishing an impenetrable barrier to discovery of opinion work product. *See Brown v. Superior Court,* 137 Ariz. 327, 670 P.2d 725, 735 (1983) (*en banc*). *But see* Paul W. Burke & Kenneth A. Hindman, *Protecting the Insurer's Work Product: Is There a "Bad Faith" Exception?,* 53 Ins.Couns.J. 223 (1986) (arguing that bad faith cases against insurers render the work product protection relatively meaningless).

Courts frequently refer to the work product doctrine as providing a qualified immunity from discovery. *See, e.g., Palmer v. Farmers Ins. Exchange,* 261 Mont. 91, 861 P.2d 895, 910 (1993). As a result, the work product doctrine generally provides a lesser degree of protection from discovery than the attorney-client privilege. Although the doctrine provides less *protection* than the attorney-client privilege (in the sense that it is more easily circumscribed), its coverage encompasses a greater amount of materials. *See Moody v. Internal Revenue Service,* D.C.Cir., 654 F.2d 795, 798 (1981). Nevertheless, any party that shows a "substantial need with an inability to obtain the substantial equivalent elsewhere" can gain access to non-opinion attorney work product. Super.Ct.Civ.R. 26(b)(3); *see Phillips Petroleum Co. v. Arco Alaska Inc.,* Del. Ch., C.A. No. 7177, slip op. at 8–9, 1986 WL 508, Jacobs, V.C. (Dec. 16, 1986) ("Under exceptional circumstances a party may be deemed to have waived the work product immunity if he raises issues, asserts defenses, or presents evidence in the litigation that necessarily require disclosure of opinion work product").[4]

We read the mandatory language of Rule 26(b)(3), which directs courts to "protect against disclosure," to require *additional* protection of opinion work product, not to require its *absolute* protection. Accordingly,

we interpret Rule 26(b)(3) as requiring a party to show that it has a more "substantial need" to review opinion work product than would be required for that party to review non-opinion work product. *See Upjohn,* 449 U.S. at 401–02, 101 S.Ct. at 688–89 ("While we are not prepared at this juncture to say that [opinion work product] is always protected by the work product rule, we think a far stronger showing of necessity and unavailability by other means … would be necessary to compel disclosure."); *Nobles,* 422 U.S. at 238, 95 S.Ct. at 2170 (noting that the work product doctrine grants counsel "a privileged area [*not an absolute area*] within which he can analyze and prepare his client's case").

The question, therefore, becomes what constitutes a "more 'substantial need.'" We hold that, in order to obtain mental impressions under Rule 26(b)(3), the mental impressions must be directed to the pivotal issue in the current litigation and the need for the material must be compelling. *See Holmgren,* 976 F.2d at 577; *see also Bio–Rad Laboratories, Inc. v. Pharmacia, Inc.,* N.D.Cal., 130 F.R.D. 116, 122 (1990) (finding "the better rule to be that 'an attorney's opinion work product is discoverable where such information is directly at issue and the need for production is compelling' ") (quoting *Handgards, Inc. v. Johnson & Johnson,* N.D.Cal., 413 F.Supp. 926, 933 (1976)).

■■■ When applied to this case, the pivotal issue/compelling need standard supports the Superior Court's order of production. A plaintiff seeking to establish a claim of bad faith in a first-party insured-insurer contractual relationship must show that the insurer lacked reasonable justification in delaying or refusing payment of a claim. As part of its standard claims handling procedure, State Farm sought the advice of Tybout, its outside counsel. Because State Farm typically consults with an attorney regarding the value of an insured's claim, State Farm's rejection of counsel's advice in this case created critical evidence supporting a claim for

4. Although *Phillips* employed a waiver rationale, the policies underlying a waiver analysis coincide with the policies underlying our analysis here. In a pivotal issue/compelling need analysis

(and in a waiver analysis), the reviewing court will concern itself with promoting fairness in litigation and with preventing a party from using work product as a litigation weapon.

bad faith, *i.e.*, the rejection of the advice provided significant evidence tending to show a lack of reasonable justification to deny the claim. *Cf. American Mut. Liability Ins. Co. of Boston, Mass. v. Cooper*, 5th Cir., 61 F.2d 446, 448 (1932), *cert. denied*, 289 U.S. 736, 53 S.Ct. 595, 77 L.Ed. 1483 (1933); *cf. also* Nielsen, *Advice of Counsel, supra* note 12, at 538 (arguing that *reliance* on advice of counsel provides an absolute defense to a claim for bad faith).

Tybout opined in November of 1986 that the Tackett claim was worth the policy limit of $50,000, after previously noting that further discovery of Mrs. Tacketts' condition was of questionable benefit. As State Farm correctly points out, it initially declined to follow Tybout's advice (as well the advice of its claims representative, Linda Walters) that the Tackett claim was worth the $50,000 policy limit. By rejecting counsel's advice, an insurer creates one of the few situations in which the strategy, mental impressions and opinion of the insurer's agents concerning the claim become a pivotal issue in the litigation case. *See Holmgren*, 976 F.2d at 577 ("In a bad faith insurance claim settlement case, the 'strategy, mental impressions and opinions of [the insurer's] agents concerning the handling of the claim are directly at issue.'") (quoting *Reavis*, 117 F.R.D. at 164). Rejection of counsel's opinion would not establish the insurer's *per se* bad faith in settlement of the claim. Nevertheless, in bad faith cases, counsel's opinion that the case should be settled for a certain amount can carry significant weight (depending on the attorney's experience, reputation, and other relevant factors). The rejection of the advice, therefore, presents a plaintiff with potentially cogent evidence.[5]

The processing of a claim by an insurer is almost entirely an internal operation and its file reflects a unique, contemporaneous record of the handling of the claim. The need for such information "is not only substantial, but overwhelming." *Brown*, 137 Ariz. 327, 670 P.2d at 734. The Tacketts' claim for bad faith and State Farm's affirmative reliance on the "routine handling" of the case implicated the *entire* claim file (without excluding advice of counsel), thus creating a compelling need to discover the full context in which State Farm handled their claim. A contrary finding would require a plaintiff, and the Court, to accept as true the insurer's assertions that it handled the claim in a proper manner.

■■■■ While we conclude that the Tacketts have met the standard of compelling need to examine counsel's opinions concerning their claim, production of opinion work product should not be ordered without an *in camera* examination by the trial court, as occurred here. Because of the presumptive confidentiality of such materials, such disclosure is not to be routinely granted in bad faith cases. Before allowing *in camera* review, the trial court must " 'require a showing of a factual basis adequate to support a good faith belief by a reasonable person' that *in camera* review of the materials may reveal evidence to establish the claim." *Zolin*, 491 U.S. at 572, 109 S.Ct. at 2631 (quoting *Caldwell v. District Court*, Colo.Supr., 644 P.2d 26, 33 (1982) (citation omitted)). If the party seeking disclosure meets this burden, the trial court may exercise its discretion in reviewing the materials and require production under the compelling need standard.

## III

### A.

We next consider the Tacketts' appeal from the Superior Court rulings at trial which denied recovery for emotional distress and punitive damages. The Tacketts contend that the trial court limited the scope of the jury's award by application of a restrictive standard for recovery of damages in

5. We also note that discovery of mental impressions in a bad faith action may not always be relevant.

    While the claim file generally is discoverable, the scope of permissible discovery should be considered in light of the plaintiff's allegations. For example, while a coverage opinion within an adjuster's file may be relevant in a duty to defend case, this same letter would not be relevant in a duty to settle case.

    Donald B. Hilliker and Michael M. Marick, *The Bad Faith Case: Litigation Techniques and Strategies, From the Defense Perspective*, 38 PLI/Comm. 99 (1988).

insurance bad faith cases. An analysis of the correctness of the trial court's rulings requires this Court to address directly a matter of first impression in Delaware—the nature of a claim for bad faith arising out of an insurer's denial of policy benefits and the scope of recovery of consequential damages.

At the outset, we note that we are confronted with a dispute over first-party coverage, *i.e.*, a claim by an insured that an insurer failed to make timely payments under a policy provision. Third-party claims asserted against both the insurer and the insured have the potential to create a conflict of interests and may involve fiduciary duties on the part of the insurer. These third-party cases implicate separate bad faith concerns. We have had no occasion to pass upon the cognizability of such claims and do not do so here.

### B.

■ There is a difference of judicial opinion whether a first-party claim against an insurer for bad faith denial or delay in claim payment sounds in tort or in contract. The debate is prompted, as in this case, by the difference in the recovery of damages. If the bad faith claim is viewed as an independent tort, the insured's recovery may include damages for emotional distress, as well as for economic loss. *See Bibeault v. Hanover Ins. Co.*, R.I.Supr., 417 A.2d 313, 319 (1980). By contrast, if the bad faith claim is viewed as arising *ex contractu*, the damages generally are confined to the payment of money due, with interest for delay. *See Lawton v. Great Southwest Fire Ins. Co.*, 118 N.H. 607, 392 A.2d 576, 578 (1978). In this case, because the Tacketts had received the $50,000 policy limits before trial, the Superior Court permitted recovery only for interest during the period of unreasonable delay.

This Court has indicated that claims by insureds concerning coverage disputes are subject to a contractual analysis. *Travelers Indem. Co. v. Lake*, Del.Supr., 594 A.2d 38, 41 (1991). Except to the extent that statutory restrictions or public policy dictate a different result, contractual principles govern claims by an insured arising under no-fault, *Adams v. Delmarva Power & Light Co.*,

Del.Supr., 575 A.2d 1103, 1106 (1990), or uninsured/underinsured coverage. *Cf. Hurst v. Nationwide Mut. Ins. Co.*, Del.Supr., 652 A.2d 10 (1995). The relationship between an insured and an insurer arises from a mutual exchange of consideration, *i.e.*, payment of premiums in exchange for the extension of coverage, with performance controlled by written standards and conditions set forth in a policy of insurance. If a claim arises concerning a breach of the terms of that agreement, whether it be a dispute over coverage, or an exclusion or delay in payment of a claim, the remedy should be for breach of contract. We therefore align ourselves with those jurisdictions which have concluded that "there is no sound theoretical difference between a first-party insurance contract and any other contract." *Beck v. Farmers Ins. Exchange*, Utah Supr., 701 P.2d 795, 800 (1985); *see also Johnson v. Federal Kemper Ins. Co.*, 74 Md.App. 243, 536 A.2d 1211, 1213 (1988); *Duncan v. Andrew County Mut. Ins. Co.*, Mo.App., 665 S.W.2d 13, 19 (1983).

■ Where an insurer fails to investigate or process a claim or delays payment in bad faith, it is in breach of the implied obligations of good faith and fair dealing underlying all contractual obligations. *See Merrill v. Crothall–American, Inc.*, Del.Supr., 606 A.2d 96, 101 (1992). A lack of good faith, or the presence of bad faith, is actionable where the insured can show that the insurer's denial of benefits was "clearly without any reasonable justification." *Casson v. Nationwide Ins. Co.*, Del.Super., 455 A.2d 361, 369 (1982). The Superior Court instructed the jury in this case under the *Casson* standard and, although State Farm has not appealed the jury's determination of bad faith delay, we take the occasion to adopt the contractual basis for a bad faith action against an insurer as a prelude to our rulings on the claims of error by the Tacketts directed to the Superior Court's rulings on damages.

### C.

■ The rule formulated in *Hadley v. Baxendale*, 156 Eng.Rep. 145 (1854), has been recognized by the courts of this country as controlling the scope of damages recovera-

ble for breach of contract. *See generally* Melvin A. Eisenberg, *The Principle of Hadley v. Baxendale,* 80 Calif.L.Rev. 563 (1992). Recovery is limited to those damages that arise naturally from the breach or that were reasonably foreseeable at the time the contract was made. *McClain v. Faraone,* Del.Super., 369 A.2d 1090, 1092 (1977). Because of the foreseeability requirement of *Hadley,* courts have generally precluded a party from obtaining damages for the emotional distress caused by breach of contract. This restriction has been applied in insurance bad faith cases to preclude recovery for emotional distress. *See Lawton,* 118 N.H. 607, 392 A.2d at 581–82; *Beck,* 701 P.2d at 802; *see also* Roger C. Henderson, *The Tort of Bad Faith in First–Party Insurance Transactions: Refining the Standard of Culpability and Reformulating the Remedies by Statute,* 26 U.Mich.J.L.Ref. 1, 57 (1992) ("[S]ome emotional distress will almost always accompany the denial of a claim. People get very upset when insurance companies reject their claims, and thus such damages can be claimed in almost every case.")

Historically, Delaware has not permitted the recovery of damages for emotional distress unaccompanied by physical injury. *Mergenthaler v. Asbestos Corp. of Am.,* Del. Supr., 480 A.2d 647, 651 (1984); *McClain,* 369 A.2d at 1094. In urging recovery for emotional distress for State Farm's failure to abide by its contractual obligation, the Tacketts rely upon this Court's decision in *Cummings v. Pinder,* Del.Supr., 574 A.2d 843 (1990). *Cummings* sanctioned the award of damages for emotional distress, independent of any showing of physical injury. *Id.* at 845. *Cummings* is clearly distinguishable because the plaintiff's claim was one of intentional infliction of emotional distress in the course of legal malpractice. *Id.* In affirming the Superior Court's grant of damages for emotional distress, we stated that "[t]he award of damages for emotional distress, even though unaccompanied by evidence of physical harm is sustainable ... [given] that Cummings' conduct was intentional and within the con-

text of the attorney-client relationship." *Id.* See also *Correa v. Pennsylvania Mfrs. Ass'n Ins. Co.,* D.Del., 618 F.Supp. 915, 927 (1985) (applying Delaware law).[6]

### D.

■ Although we agree with the Superior Court that there is no basis for the recovery of damages for emotional distress in the absence of intentional conduct under the facts of this case, an insured may be entitled to the recovery of punitive damages in a bad faith action if the insurer's breach is particularly egregious. Here, the Superior Court ruled that State Farm's conduct, while supportive of a finding of bad faith, did not rise to the level of recklessness or malice so as to warrant the imposition of punitive damages.

This Court has not had occasion to rule upon the recoverability of punitive damages in a contractual action, but the standard for such recovery under Delaware law as applied in tort settings would appear flexible enough to find equal application. In *Jardel v. Hughes,* Del.Supr., 523 A.2d 518 (1987), we described that standard as follows:

> The penal aspect and public policy considerations which justify the imposition of punitive damages require that they be imposed only after a close examination of whether the defendant's conduct is "outrageous," because of "evil motive" or "reckless indifference to the rights of others." ... Mere inadvertence, mistake or errors of judgment which constitute mere negligence will not suffice. It is not enough that a decision be wrong. It must result from a conscious indifference to the decision's foreseeable effect.

*Id.* at 529 (quoting *Restatement (Second) of Torts* § 908, cmt. b (1979) (citations omitted)).

■ The processing of a claim by an insurer encompasses the making of judgment on at least two levels: (a) determining whether the claim is within the policy's coverage; and (b) where damages are not liqui-

---

6. The Tacketts argue that, like *Cummings,* their claim arose in a relationship of "trust and confidence." While there may be a fiduciary obligation in an insurer's handling of a third-party claim, "[t]he mere relationship of insurer and insured does not import an obligation of trust." *Craig v. Iowa Kemper Mut. Ins. Co.,* Mo.App., 565 S.W.2d 716, 723 (1978).

dated, determining the amount of compensation. Mere delay is not evidence of bad faith, provided that a reasonable justification exists for refusing to make payment upon submission of proof of loss. Delays attributed to a "get tough" policy, *i.e.,* a general business practice of claims denial without a reasonable basis, may subject the insurer to a bad faith claim. Additionally, if the denial or delay is wilful or malicious, it may provide the basis for punitive damages. In the latter event, there must be an element of malice with a "reckless indifference" to the plight of the insured. *Jardel,* 523 A.2d at 529; *see also State Farm Mut. Auto. Ins. Co. v. Weiford,* Alaska Supr., 831 P.2d 1264, 1267, 1270 (1992) (State Farm's "tough stance" policy, alone, is not sufficient to support claims for punitive damages); *Hayseeds, Inc. v. State Farm Fire & Cas.,* 177 W.Va. 323, 352 S.E.2d 73, 80–81 (1986) (evidence of lack of judgment, incompetence or bureaucratic confusion does not justify submission of issue of punitive damages to jury).

Here, as in *Weiford,* the Tacketts have not shown either malicious or reckless conduct on the part of State Farm. The "tough stance" policy was merely one part of State Farm's dilatory handling of the Tacketts' claim. While a delay of seven months in paying policy limits in the face of full documentation and recommendations of the claim agent and outside counsel may well constitute bad faith, we agree with the Superior Court that the Tacketts were not singled out for malicious treatment. In the absence of a showing of egregious conduct there was no basis for submission of punitive damages claim to the jury.

### IV

In sum, we hold that the Superior Court did not err in requiring production of materials sought to be protected by State Farm under the attorney-client privilege and the work product doctrine. Those materials were thus available for use at the trial of the Tacketts' bad faith claim. We also affirm the Superior Court's trial ruling which precluded recovery for emotional distress experienced by Mrs. Tackett because there was no accompanying physical injury. Finally, while puni-

tive damages are recoverable for an egregious or malicious breach of a contract of insurance, the Superior Court correctly determined that the Tacketts had failed to make the requisite evidentiary showing in this case to support such an award.

The judgments of the Superior Court are AFFIRMED as to both the principal appeal and the cross-appeal.