# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CARLYLE INVESTMENT MANAGEMENT L.L.C., TC GROUP, L.L.C., TCG HOLDINGS, L.L.C., DAVID M. RUBENSTEIN, DANIEL A. D'ANIELLO, WILLIAM E. CONWAY, JR., JAMES H. HANCE, JOHN C. STOMBER, and MICHAEL J. ZUPON, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 7841-VCP |
| v. | ) ) ) | |
| MOONMOUTH COMPANY S.A., PLAZA MANAGEMENT OVERSEAS S.A., PARBOLD OVERSEAS LTD., LOUIS J.K.J. REIJTENBAGH, and STICHTING RECOVERY CCC, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 19, 2014
Date Decided: February 24, 2015

R. Judson Scaggs, Jr., Esq., Shannon E. German, Esq. MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Robert A. Van Kirk, Esq., R. Hackney Wiegmann, Esq., Sarah F. Teich, Esq., Brian C. Rabbitt, Esq., WILLIAMS & CONNOLLY LLP, Washington, D.C.; *Attorneys for Plaintiffs*.

Michael F. Bonkowski, Esq., COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A., Wilmington, Delaware; Alan Kolod, Esq., Mark N. Parry, Esq., MOSES & SINGER LLP, New York, New York; *Attorneys for Plaza Management Overseas S.A. and Louis J.K.J. Reijtenbagh*.

David L. Finger, Esq., FINGER & SLANINA, LLC, Wilmington, Delaware; *Attorneys for Liquidators of Carlyle Capital Corporation Limited (in Liquidation)*.

**PARSONS, Vice Chancellor.**

Although this case is stayed on the merits, I allowed discovery solely on the issue of personal jurisdiction over the defendants. What resulted is an international discovery dispute. Before the Court is a motion by the Liquidators of Carlyle Capital Corporation Limited (in Liquidation) ("CCC") to intervene in this action for the limited purpose of seeking a protective order concerning the authorized discovery.[1] For the reasons that follow, the motion to intervene is granted, and the motion for a protective order is granted without prejudice to the plaintiffs' ability to renew their motion to compel in accordance with Section II.E of this Memorandum Opinion.

## I. BRIEF BACKGROUND

CCC is a Guernsey limited company, incorporated and registered in the Bailiwick of Guernsey, a British Crown dependency. CCC lost over a billion dollars during the financial crisis and was placed into liquidation in March 2008. The Liquidators are officers of the Royal Court of Guernsey and are charged with winding up the affairs of CCC and attempting to extract any remaining value for its stakeholders. After investigation, the Liquidators determined that CCC's only remaining potentially valuable assets were claims against those persons and entities involved with CCC's management and operations. The plaintiffs in this case, Carlyle Investment Management, L.L.C. and various related entities and persons (together, "Plaintiffs" or "Carlyle"),[2] are the

---

[1] Liquidators' Mot. to Intervene ("MTI") 1.

[2] The other plaintiffs are: TC Group, L.L.C., TCG Holdings, L.L.C., David M. Rubenstein, Daniel A. D'Aniello, William E. Conway, Jr., James H. Hance, John C. Stomber, and Michael J. Zupon.

1

defendants in contentious litigation that ensued—and remains ongoing—in Guernsey (generally, the "Guernsey Litigation"). Louis J.K.J. Reijtenbagh and entities related to him (together, "Defendants")[3] previously held a significant stake in CCC. Plaintiffs allege that Reijtenbagh violated certain releases between him and Carlyle by pursuing, assisting with, or financing litigation against Carlyle.

To pursue the Guernsey Litigation in light of CCC's financial situation, the Liquidators required outside litigation funding, which they eventually received from various unknown parties. Defendants allegedly provided at least some of that funding, in violation of the releases.

Defendants previously attempted to remove this case to federal court. That effort failed and the case was remanded back to this Court. Defendants appealed the remand order. On May 6, 2014, I stayed this case pending the Third Circuit's decision on Defendants' appeal (the "May 2014 Decision"). The Third Circuit heard argument on that appeal on June 4, 2014, and took the case under advisement. Although I decided to stay all merits-related litigation in this case, I allowed the parties to conduct limited discovery relating to personal jurisdiction in Delaware, because "that discovery likely would be useful no matter what the outcome of the appeal is."[4] When I allowed that

---

[3]    The other defendants are: Moonmouth Company S.A., Plaza Management Overseas S.A., Parbold Overseas Ltd., and Stichting Recovery CCC.

[4]    Mot. to Stay Arg. Tr. 52.

limited discovery to proceed, it was anticipated that the parties could coordinate on this narrow issue without oversight by this Court.[5] That hope was misplaced.

On May 14, 2014, Defendants moved for reconsideration of the May 2014 Decision and for a protective order. Plaintiffs opposed that motion, and I denied it in a letter opinion dated August 21. On July 21, Plaintiffs moved to compel production of certain documents relating to Defendants' alleged funding of the CCC Liquidators and the various lawsuits filed by the Liquidators, one of which initially was pending in Delaware. After briefing, I heard argument on the motion to compel on August 28, 2014, at which time I granted Plaintiffs' motion in part (the "Production Order").

On September 8, the Liquidators moved to intervene in this action for the purpose of seeking a protective order as to the documents I ordered produced, which dealt with the nature of the relationship between Defendants and the Liquidators (the "Discovery Documents"). The Liquidators asserted that the Discovery Documents are protected by confidentiality orders of the Royal Court of Guernsey and are subject to litigation privilege under Guernsey law and work product immunity under Delaware law. Briefing on the Liquidators' motion concluded on October 16.[6] I heard argument on October 20, 2014 (the "Argument"). At the Argument, it was disclosed that, despite the Production

---

[5]    *Id.* at 52-53.

[6]    Briefing on the motion to intervene and for a protective order consisted of: (1) the MTI; (2) Plaintiffs' Opp'n Br. ("POB"); (3) the Liquidators' Reply Br. ("LRB"); (4) Defendants' "Reply" Br. in Supp. of Intervention ("DRB"); (5) Plaintiffs' Sur-Reply in Opp'n ("PSRB"); and (6) the Liquidators' Opp'n to the Sur-Reply ("LOSR").

Order, Defendants had not produced any of the Discovery Documents.[7] I again ordered the Discovery Documents produced (the "Second Production Order"),[8] but limited access to them to Defendants' lawyers not involved in the Guernsey Litigation.[9] I also required Defendants to file a compliance statement.[10]

Defendants submitted the required compliance statement on November 10 (the "Compliance Statement"). According to the Compliance Statement, Defendants produced: (1) a redacted copy of the Funding Agreement with a redaction log; and (2) a privilege log of individual documents in their possession consisting of the communications potentially concerning the relationship between Defendants or their affiliates and the Liquidators. Those communications, referred to herein as the Discovery Documents, are 92 documents comprising roughly 700 pages that concern the negotiations between an affiliate of Defendants and the Liquidators pertaining to the funding agreement. The Liquidators have asserted claims of privilege and confidentiality as to all 92 documents.

---

[7]   MTI Arg. Tr. 25-27.

[8]   *Id.* at 27 ("You are going to list every single one of the documents that I ordered produced that now—that are in your possession that have not been produced. And if you've got some basis as to why they're not produced, then you state what it is.").

[9]   *Id.* at 87-89. In terms of the attorneys of record for Defendants in this action, this meant that Plaintiffs' attorneys at Morris, Nichols, Arsht & Tunnell ("Morris Nichols") were to receive the documents, but that Plaintiffs' counsel at Williams & Connolly were not to have access to them.

[10]   *Id.* at 37-38.

Finally, pursuant to a discussion of certain other issues at the Argument, the parties were given an opportunity to file supplemental briefing focused on when the Liquidators first became aware of this case. That supplemental briefing concluded on November 19, 2014.[11]

## II. ANALYSIS

Several issues require resolution. First, can the Liquidators intervene in this case under the rules of this Court? Second, did the Liquidators unreasonably delay in moving to intervene such that I should hold their claims of privilege and confidentiality waived? Third, are the Discovery Documents protected by work product privilege or litigation privilege, which is the Guernsey equivalent of work product? Fourth, how should this case proceed from this point?

### A. Can the Liquidators Intervene?

#### 1. Standard for intervention

In certain situations a nonparty may intervene in a case pending before this Court, either as of right or by permission of the Court in its discretion. Court of Chancery Rule 24(a) governs intervention as of right and states that

> [u]pon timely application anyone shall be permitted to intervene in an action: (1) [w]hen a statute confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair

---

[11] The supplemental briefing consisted of: (7) the Liquidators' Supplemental Br. in Supp. of the MTI ("Ls.' Suppl. Br."); and (8) Plaintiffs' Supplemental Br. in Opp'n to the MTI ("Pls.' Suppl. Br.").

or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.[12]

A potential intervenor "need only claim, rather than prove, an interest in the subject of the litigation; the validity of that claimed interest is assessed by reference to the allegations accompanying the motion to intervene, and such allegations are accepted as true."[13]

Even if a person does not have a right to intervene, he still may be permitted to intervene under the less exacting standard of Rule 24(b), which allows intervention "(1) [w]hen a statute confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common."[14] If a person desires to intervene, he must serve a motion so indicating upon all of the parties, stating the grounds therefore, as well as a pleading setting forth the claim or defense for which intervention is sought.[15] "Necessarily, however, under either variety of intervention the applicant must, as a threshold matter, present a potentially valid claim."[16]

---

[12] Ct. Ch. R. 24(a).

[13] *Harris v. RHH P'rs, LP,* 2009 WL 891810, at *3 (Del. Ch. Apr. 3, 2009).

[14] *See* Ct. Ch. R. 24(b); *United Rentals, Inc. v. RAM Hldgs., Inc.,* 2007 WL 4327770, at *1 (Del. Ch. Nov. 29, 2007).

[15] Ct. Ch. R. 24(c).

[16] *United Rentals, Inc.,* 2007 WL 4327770, at *1.

**2.      The Liquidators satisfy the standard for mandatory intervention**

The Liquidators seek to intervene under Rule 24(a) "for the limited purpose of seeking a protective order concerning discovery ordered by this Court."[17]  For the Court to grant that request, the Liquidators must have: (a) timely moved to intervene, (b) in order to protect a property interest at issue in this case, (c) that would be impaired by the disposition of this action, (d) under circumstances where their interests are not adequately represented by Defendants.  The Liquidators satisfy these requirements, with the possible exception of timeliness, which I address in the next Section.

Generally, the Liquidators wish to assert privilege over a series of documents relating to Defendants' funding of the Liquidators' lawsuits against Carlyle.  The Liquidators assert that discovery into their funding agreement and related documents, *i.e.*, the Discovery Documents, will reveal their mental impressions and evaluations as to the strengths and weaknesses of the ongoing litigation in Guernsey.  This Court twice has ordered production of those documents.  Consequently, the disposition of this action would impair the Liquidators' interest in protecting the Discovery Documents.  I am satisfied that the Liquidators' interest in attempting to protect the confidentiality of their funding documents and negotiations is a sufficiently significant interest as to satisfy the Rule 24(a)(2) standard.  Absent intervention, that interest would be impaired because the

---

[17]      MTI 1.

disputed documents would have to be produced.[18]  Thus, elements (b) and (c) of the applicable standard are satisfied.

Although Plaintiffs argue otherwise, the Liquidators' interests are not adequately represented by Defendants.  In this action, Plaintiffs accuse Defendants of having breached a release between them.  The Liquidators have no interest in that dispute beyond their efforts to keep confidential the Discovery Documents.  Instead, the Liquidators represent CCC, and it is on behalf of CCC that the Liquidators assert their privilege claims under Guernsey and Delaware law.  Defendants have no standing to assert such privilege claims—particularly those asserted under Guernsey law.  For that reason, I find that the Liquidators' interests are not adequately represented by Defendants.[19]  Accordingly, element (d) of the standard under Rule 24(a) also is satisfied.

**B.      Should the Court Conclude that the Liquidators Are Estopped from Asserting Privilege Claims Because of Their Tactical Delay?**

Having determined that the Liquidators meet the other requirements for intervention under Rule 24(a), I turn to the dispute over the timeliness of their motion.

---

[18]    *See, e.g.*, *Stornawaye Capital LLC v. Smithers*, 2010 WL 673291, at *2 (Del. Ch. Feb. 12, 2010) (concluding that alleged interest in a property subject to foreclosure satisfied the Rule 24(a)(2) requirement); *Noe v. Kropf*, 2008 WL 4603577, at *4 (Del. Ch. Oct. 15, 2008) (finding that being a stockholder satisfied the Rule 24(a)(2) requirement in a Section 225 action); *Flynn v. Bachow*, 1998 WL 671273, at *2 (Del. Ch. Sept. 18, 1998) (granting a motion to intervene on the basis that intervenor brought a colorable claim that the defendant violated the limited partnership agreement by not seeking approval from an advisory committee before making an investment).

[19]    *See Noe*, 2008 WL 4603577, at *4 (determining that failure to allow intervention likely would result in default judgment against the defendants).

This Court issued the Production Order on August 28, 2014. The Liquidators moved to intervene on September 8. Normally, seeking to intervene slightly more than a week after it became clear that one's interests could be affected adversely would not be deemed untimely. Plaintiffs, however, argue that the Liquidators knew about this action and the relevant discovery dispute significantly earlier and tactically delayed becoming involved in the hope that I would not compel production of the Discovery Documents. On that basis, Plaintiffs aver that the Liquidators could have intervened at least a month sooner, which would have conserved resources, because the Court would not have been forced to rule piecemeal on two consecutive motions that concern essentially the same subject matter.

Tardiness in moving to intervene can be a valid reason to deny a motion for intervention.[20] Here, the parties vigorously dispute when the Liquidators had notice that Plaintiffs were seeking the funding agreement and related documents. The Liquidators assert that they did not know about the discovery dispute until September 2, 2014.[21] Even assuming that assertion is true, there remains the issue of whether the Liquidators'

---

[20] *See, e.g.*, *In re Crimson Exploration S'holder Litig.*, at \*28 (Del. Ch. Oct. 24, 2014) (noting "serious concern" with the fact that the proposed intervenor waited for five months after his related action was stayed and after briefing on the defendants' motion to dismiss concluded before attempting to intervene); *Great Am. Leasing Corp. v. Republic Bank*, 2003 WL 22389464, at \*1 (Del. Ch. 2003) (finding intervention untimely when proposed intervenors had actual knowledge of the action for nearly nine months); *Peak Prop. & Cas. Ins. Co. v. Speed*, 2010 WL 530072, at \*4 (Del. Super. Feb. 12, 2010) (holding that delay of one year was unreasonable and rendered application to intervene untimely).

[21] MTI, Affidavit of Christopher Morris ("Morris Aff.") ¶ 55.

lawyers knew that Plaintiffs were seeking the Discovery Documents, because such knowledge arguably would be imputed to the Liquidators.[22] Plaintiffs aver that they subpoenaed several of the Liquidators' United States lawyers on July 15 and 16, 2014, and that the Liquidators accordingly knew about these proceedings roughly two-and-a-half months before they moved to intervene.[23] The parties dispute, however, whether those discovery requests were within the subject matter of the domestic lawyers' employment. Although it is plausible that the requests were within the scope of those lawyers' employment, the answer is not clear cut.[24]

What is clear, however, is that the Liquidators' apparent lead lawyer, Jason Karas of the Australian law firm Lipman Karas, did have notice that Plaintiffs were seeking the Discovery Documents before the August 28 hearing on the motion to compel. According to his affidavit, Karas was informed in general terms about this case sometime in late 2012.[25] On July 16, 2014, the United States attorneys informed Karas that they had been subpoenaed by Plaintiffs regarding "information about any funding agreements between

---

[22] *Ocean Drilling & Exploration Co. v. Pauley Pan Am. Petrol. Co.*, 1965 WL 90028, at \*2 (Del. Super. Dec. 10, 1965) ("Generally, knowledge of facts relating to the subject matter of an attorney's employment, acquired by him during his employment, and relevant to that employment, are imputed to his client.").

[23] POB 13-14.

[24] PSRB, Exs. A-C (listing these lawyers as counsel of record in cases where the Liquidators were seeking discovery from United States companies in aid of the Guernsey Litigation).

[25] Ls.' Suppl. Br., Affidavit of Jason Karas ("Karas Aff.") ¶ 49.

the CCC Liquidators and Defendants or their affiliates."[26]  On August 3, an affiliate of Defendants informed Karas that Plaintiffs were seeking to depose Defendants and that questions concerning the funding agreements could be asked.[27]  Finally, sometime between August 22 and 24, an affiliate of Defendants told Karas that a hearing would occur in late August—the motion to compel hearing at which this Court issued the Production Order—and that Plaintiffs were seeking discovery of documents relating to the Liquidators' funding.[28]  From this record, I find that Karas knew the Discovery Documents were at risk of being compelled by, at the latest, early August, several weeks before the Production Order.

Plaintiffs take the position that this delay is inexcusable in light of its tactical justification: the Liquidators refused to intervene sooner, according to Plaintiffs, because doing so would reveal that Defendants in fact were funding the Liquidators.  There is, however, no bright-line rule on when an application is "timely."  The cases finding untimeliness or expressing serious concern about unwarranted delay involved delays of between five and twelve months.[29]  Even assuming the mid-July imputed knowledge date, I do not consider such a delay so long as to be "inexcusable."[30]  Furthermore, and

---

[26]     *Id.* ¶ 52.

[27]     *Id.* ¶¶ 59-60.

[28]     *Id.* ¶ 63.

[29]     *See supra* note 20.

[30]     *Great Am. Leasing Corp.,* 2003 WL 22389464, at *2 ("If the delay is inexcusable, disruption to the schedule is reason enough to deny intervention.").

11

notwithstanding the fact that the jurisdictional discovery in this case evidently overlaps significantly with the merits discovery, this case remains in the early procedural stages and is stayed pending resolution of the appeal to the Third Circuit. Accordingly, I cannot conclude that the Liquidators' one- or two-month delay was inexcusable.[31] Finally, given the procedural posture of this action, the prejudice in terms of further delay to Plaintiffs, if any, does not justify precluding the Liquidators from attempting to assert their privilege arguments. Such a holding would not be a proportionate or equitable outcome.[32]

## C. Are the Discovery Documents Protected by Delaware's Work Product Privilege or its Guernsey Analog?

The Liquidators argue that the Discovery Documents are protected by litigation privilege under Guernsey law, which appears to be a similar concept to work product privilege. Alternatively, if Delaware law applies, the Liquidators argue that work product privilege covers the Discovery Documents. The Liquidators specifically denied any assertion that the Discovery Documents are protected by the attorney-client privilege or

---

[31] *Cf. CAPM Corp. Advisors AB v. Protegrity, Inc.*, 2001 WL 1360122, at *11 (Del. Ch. Oct. 30, 2001) (finding a four-month delay unreasonable when the motion to intervene came the same day as oral argument for summary judgment).

[32] Plaintiffs further argue that the Liquidators have not been candid with the Court. Our Supreme Court, citing Delaware Rule of Professional Conduct 3.3, recently noted that, "Just like attorneys have duties of candor to the tribunal, so too do parties themselves." *Taylor v. Taylor*, 102 A.3d 151, 154 (Del. 2014). Based on the record before me, I am not persuaded that the Liquidators have not been candid with the Court. The statements of the Liquidators and their counsel in the Guernsey litigation regarding their knowledge of these proceedings, however, border on misleading and have unnecessarily imposed upon the resources of this Court. I expect more forthright communication in the future.

12

any Guernsey analog.[33]  Accordingly, I do not address the attorney-client privilege.  For the reasons that follow, I conclude that Delaware law governs and that the documents are protected by work product privilege.

### 1.	Conflict of Laws

"'Under general conflict of laws principles, the forum court will apply its own conflict of laws rules to determine the governing law in a case.'"[34]  "In cases where foreign law may be applicable, 'the party seeking the application of foreign law has the burden of not only raising the issue that foreign law applies, but also the burden of adequately proving the substance of the foreign law.'"[35]  The Liquidators contend that Guernsey law governs.  As such, they bear the burden of adequately proving what Guernsey law provides on the subject of applying the litigation privilege to litigation funding agreements.

Plaintiffs argue that Delaware law controls because either Guernsey law is unknown or consistent with Delaware law, meaning that there is no conflict of laws.  To the extent that neither jurisdiction has ruled on the subject using its own laws, this Court will not attempt to divine foreign law, then determine Delaware law, and then proceed

---

[33]	LRB 9.

[34]	*Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 765-66 (Del. Ch. 2014) (quoting *Tyson Foods, Inc. v. Allstate Ins. Co.*, 2011 WL 3926195, at *5 (Del. Super. Aug. 31, 2011)).

[35]	*Id.* at 765 (quoting *Republic of Pan. v. Am. Tobacco Co.*, 2006 WL 1933740, at *4 (Del. Super. June 23, 2006), *aff'd sub nom. State of Sao Paolo of Federative Republic of Braz. v. Am. Tobacco Co.*, 919 A.2d 1116 (Del. 2007)).

with a conflict of laws analysis. Instead, "[w]here neither jurisdiction has decided the particular issue, 'the Court will not read a conflict where none exists, and will apply the law of the forum state, Delaware.'"[36]

### a. Litigation privilege under Guernsey law

This Court is not expert in Guernsey law and, as noted, the Liquidators bear the burden of showing both that Guernsey law governs and exactly what Guernsey law on the matter is. Based on the Liquidators' submissions, it would appear that, under Guernsey law, the funding agreement either would not be protected by litigation privilege or the exact issue presented in this case has yet to be decided.

In the absence of a Guernsey decision on an issue, the courts of Guernsey look first to England and, in the absence of English authority, then to other Commonwealth jurisdictions, such as Australia.[37] Guernsey follows English law for guidance on issues of privilege.[38] The Liquidators point to no Guernsey cases addressing "claims to legal professional privilege in respect of a litigation funding agreement."[39] Thus, to the extent English courts have decided the issue, those decisions would control. Although the

---

[36]   *Homeland Ins. Co. v. CorVel Corp.*, 2013 WL 3937022, at *9 (Del. Super. June 13, 2013) (quoting *Tyson Foods*, 2011 WL 3926195, at *6).

[37]   MTI 11-12; *see also* GORDON DAWES, LAWS OF GUERNSEY 11-12, 452-53 (2003).

[38]   *See* DAWES, *supra* note 37, at 452-53 ("English principles are again followed as regards the nature and extent of legal professional privilege in addition to discovery generally.").

[39]   MTI 12.

14

Liquidators supplied no English cases on this question, and instead cited favorable Australian authorities, Plaintiffs referred the Court to an English case entirely on point.

In *Excalibur Ventures LLC v. Texas Keystone Inc.*,[40] a decision from the Queen's Bench Division of the High Court of Justice (the "English Court"), the court addressed the issue of the applicability of litigation privilege to a funding agreement and related documents. Ultimately, the English Court concluded that the privilege did not apply. According to the English Court, litigation privilege—much like the narrow version of American work product doctrine discussed *infra*—asks whether the document or communication was "brought into existence for the dominant purpose of being used in the litigation."[41] The court further stated: "It is clear . . . that it is the use of the document or its contents in the conduct of the litigation which is what attracts the privilege."[42] Accordingly, the English Court found that litigation privilege did not apply to the funding documents before it because they were not created for the dominant purpose of being used in the litigation.[43] Finally, the court noted that, in certain circumstances, a funding agreement may be covered by legal advice privilege, the English analog to attorney-client

---

[40]  [2012] EWHC (QB) 2176.

[41]  *Id.* at [18] (citing *Winterthur Swiss Ins. Co. & Ors v. AG (Manchester) Ltd. & Ors*, [2006] EWCH (Comm) 839, [67]-[71]).

[42]  *Id.* at [17].

[43]  As discussed in the next Section, the court's "dominant purpose" test resembles the "primary purpose" test applied by some United States courts; those tests are narrower than the "because of" test adopted by the Delaware courts.

privilege.[44] Ultimately, however, those concerns were not broached, because the parties agreed to redact: (1) the amount of the premium charged to reflect the funder's assessment of the merits; (2) circumstances in which the arrangement could be terminated; and (3) conditions whereby the funders must be consulted.

In response to the *Excalibur* case, the Liquidators point to two other English cases: *Arroyo v. BP Exploration Co. (Columbia) Ltd.*[45] and *Barr v. Biffa Waste Services Ltd. & Another.*[46] Those cases, however, involve After the Event ("ATE") insurance. ATE insurance has grown out of English law that requires the loser of litigation to pay the winner's costs, including attorneys' fees. To help defray the potential costs, some litigants purchase insurance. To the extent the ATE policies would involve an analysis of the merits of the litigation, the Liquidators argue that an analogy could be drawn to litigation funding agreements. But, the cited cases directly conflict: *Arroyo* found the litigation privilege applicable to ATE policies, while *Barr* concluded that the privilege did not apply. In any event, the English Court in *Excalibur* explicitly distinguished *Arroyo* and *Barr* as applying only to ATE contracts, not litigation funding agreements.[47]

---

[44]    "If and insofar as the disclosure of the funding arrangements would or might give the other side an indication of the advice which was being sought or the advice which was being given, it would be covered by legal advice privilege." *Id.* at [23].

[45]    [2010] EWHC (QB) 1653.

[46]    [2009] EWHC (TCC) 1033.

[47]    The court also strongly implied that *Arroyo*, which found the privilege applicable, was incorrectly decided: "[*Arroyo*] is a decision which can be supported, if at all,

16

To the extent that Guernsey law on the subject can be determined on the basis of a single English case, it would appear that those courts would not find litigation privilege applicable to funding agreements. The English Court's comments regarding legal advice privilege, as well as the agreed-upon redactions, leave the breadth of *Excalibur*'s holding unclear. Guernsey law on the question of work product privilege over funding documents, therefore, either finds the privilege inapplicable or is uncertain. In either event, the Liquidators have failed to establish that Guernsey law would find the litigation privilege broadly applicable to litigation funding agreements.

### b.     Work product privilege under Delaware law

Delaware has not ruled on the applicability of work product privilege to funding agreements. In fact, only a handful of American courts have addressed privilege claims in the context of litigation funding agreements.[48] Of these, few contain in-depth analyses,

---

only on the particular facts of that case." *Excalibur Ventures LLC*, [2012] EWHC (QB) 2176, [19].

[48]   *Doe v. Soc'y of Missionaries of Sacred Heart*, 2014 WL 1715376, at *3-4 (N.D. Ill. May 1, 2014) (finding work product privilege protected the plaintiffs' communications with litigation financing company and related documents); *Miller UK Ltd. v. Caterpillar, Inc.*, 17 F. Supp. 3d 711, 731-38 (N.D. Ill. 2014) (Magistrate Judge) (concluding, after a thorough analysis, that common interest exception to attorney-client privilege did not apply to communications with third-party litigation funder, but that documents plaintiffs shared with funder were protected work product); *Devon IT, Inc. v. IBM Corp.*, 2012 WL 4748160, at *1 (E.D. Pa. Sept. 27, 2012) (conclusorily determining that communications with funders and funding agreement drafts were protected as work product and protected by the attorney-client privilege under the common interest exception); *Mondis Tech., Ltd. v. LG Elecs., Inc.*, 2011 WL 1714304, at *2-3 (E.D. Tex. May 4, 2011) (concluding that documents shared with potential funders were privileged); *Leader Techs., Inc. v. Facebook, Inc.*, 719 F. Supp. 2d 373, 376-77

17

and the cases disagree on the appropriate outcome. As to work product, four cases found the privilege applicable to funding agreements and one case found it inapplicable. In general, with the exception of *Miller UK Ltd. v. Caterpillar, Inc.*, the cases do not analyze the work product issue thoroughly. In contrast, a relatively robust discussion has developed in the scholarly literature.[49] Excluding those articles debating the wisdom of whether claim funding should be allowed at all, many authors favor extending work product privilege to discussions and negotiations with claim funders as well as related documents.[50]

The modern formulation of the work product doctrine often is traced to the United States Supreme Court's opinion in *Hickman v. Taylor*.[51] Court of Chancery Rule 26(b)(3) codifies the work product rule. It reads, in relevant part:

> [A] party may obtain discovery of documents, electronically stored information, and tangible things otherwise discoverable under paragraph (b)(1) of this rule and prepared

---

(D. Del. 2010) (holding, after brief analysis, that patentee and litigation funding companies did not have a common interest, which rendered the attorney-client privilege and, apparently, work product protection unavailable).

[49]   *Miller UK*, 17 F. Supp. 3d at 718 n.1 (collecting literature).

[50]   *See, e.g.*, Michele DeStefano, *Claim Funders and Commercial Claim Holders: A Common Interest or a Common Problem?*, 63 DEPAUL L. REV. 305 (2014) (favoring common interest attorney-client privilege and work product protection for collaborative work and communications between funders and claim holders); Grace M. Giesel, *Alternative Litigation Finance and the Work-Product Doctrine*, 47 WAKE FOREST L. REV. 1083 (2012) (concluding that the involvement of alternative litigation financing entities in litigation should not affect work product privilege and that materials evaluating litigation should enjoy protection).

[51]   329 U.S. 495 (1947).

18

> in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.[52]

Whether a document receives work product protection depends upon why it was created. Courts generally apply either the broader "because of litigation" test or the narrower "primary purpose" test. In the context of litigation funding, the choice of test may be outcome-determinative.[53] Delaware applies the "because of" test. Accordingly, a document created because of litigation likely is entitled to work product protection. "If the document was created for some other reason, such as a business purpose, then it is likely not protected. . . . Delaware courts have expressly rejected the primary purpose test, which asks whether the primary purpose of the document was for litigation, in favor of the 'because of litigation' test."[54] Thus, work product protection extends relatively broadly in Delaware.

---

[52]     Ct. Ch. R. 26(b)(3).

[53]     *See* DeStefano, *supra* note 50, at 355-61 (analyzing, in the claim funding context, the work product doctrine under the Federal Rules of Civil Procedure and concluding that applying the "primary purpose" test makes it unlikely that the work product doctrine will apply, but that protection should be found under the "because of" test, even though some courts seemingly infuse a "primary purpose" analysis into the "because of" test).

[54]     *JPMorgan Chase & Co. v. Am. Century Cos.*, 2013 WL 1668393, at *3 (Del. Ch. Apr. 18, 2013).

The main question, then, is why were the Discovery Documents created?  In Delaware, "'work product protection is not precluded merely because the [document] may also serve a business function.'"[55]  Although dual purpose documents may receive work product protection, a document still must have been created "because of" the litigation.[56]  In the litigation funding context, this analysis becomes blurry because the litigation itself arguably is part of the business.  Potentially every document a third-party litigation-funding company creates is created "because of litigation" in that the company is in the business of funding litigation.

Third-party funding literally may allow a lawsuit to proceed, but it is unclear whether any of the documents or communications exchanged between the claim holder and the funder in fact would be intended for use, or even be useful, in the actual litigation—at least where the funder takes a passive role and does not actively assist with or manage the litigation.[57]  In this respect, communications between the claim holder and the third-party appear more like business transactions separate from the litigation itself.  Yet, in all probability, to get the litigation funder to supply the financing, the claim holder

---

[55]  *Id.* (quoting *Rohm & Haas Co. v. Dow Chem. Co.*, 2009 WL 537195, at *2 (Del. Ch. Feb. 26, 2009)).

[56]  *See AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2013 WL 1668627, at *1 (Del. Ch. Apr. 18, 2013) ("The key question is why was each document created?  If created because of a contract requirement, it is likely not privileged.  If created in anticipation of litigation, it is likely privileged.  The difficulty arises when both considerations played a role in the preparation of the document.").

[57]  *See* DeStefano, *supra* note 50, at 319-27 (describing and distinguishing among types of claim funders).

20

would need to convince her of the merits of the case. The negotiations between those two parties almost certainly would involve the "lawyers' mental impressions, theories and strategies about" the case, which "were only prepared 'because of' the litigation."[58] Similarly, the terms of the final agreement—such as the financing premium or acceptable settlement conditions—could reflect an analysis of the merits of the case.[59] Somewhat analogously, this Court previously has found litigation reserve numbers, as well as the process of setting them, to involve protected opinion work product because they "'reveal the mental impressions, thoughts, and conclusions of an attorney in evaluating a legal claim.'"[60] This Court also previously has emphasized that work product protection is warranted with respect to settlement considerations.[61]

According to the Compliance Statement submitted by Defendants' counsel, the Discovery Documents over which the Liquidators assert privilege "are or concern the

[58]    *Miller UK*, 17 F. Supp. 3d at 735.

[59]    *See AM Gen. Hldgs.*, 2013 WL 1668627, at \*2 ("[S]ome of these documents will nevertheless contain potential settlement considerations, predictions as to what the Court might do, and discussions of how the dispute might evolve. That type of information . . . deserves protection. It is the expression of the attorneys' discrete thought processes.").

[60]    *JP Morgan Chase*, 2013 WL 1668393, at \*3 (quoting *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 401 (8th Cir. 1987)).

[61]    *Rohm & Haas*, 2009 WL 537195, at \*2 (finding a litigation support model protected and noting, "This Court is hard pressed to think of any information that warrants greater protection under attorney work product doctrine than potential settlement strategies prepared at the direction of counsel").

21

negotiations preceding the execution of the funding agreement in October 2009."[62] The question of whether documents prepared by or for a third-party funder and shared between the funder and a party's counsel constitute work product has not previously been answered in Delaware. There is not, however, anything so unique about third-party funding as to require a different inquiry than usual in work product cases. Overall, it appears that the Discovery Documents were "prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative."[63] Additionally, the Discovery Documents more likely than not include discussions of the merits of the Guernsey Litigation and potential strategies. Thus, under Delaware case law and the clear language of Rule 26(b)(3), the Discovery Documents are entitled to work product protection. That "protection is not precluded merely because the [Discovery Documents] may also serve a business function."[64]

Admittedly, in the context of third-party funding, the overlap between business and litigation reasons for the creation of the disputed documents is more extensive than usual. The policies underlying the work product doctrine, however, favor a finding of protection. The "work product doctrine is intended to protect 'the privacy of lawyers in their work and encourag[e] the freedom of lawyers in the task of preparing their clients'

---

[62]    Compliance Statement 3.

[63]    Ct. Ch. R. 26(b)(3).

[64]    *Rohm & Haas*, 2009 WL 537195, at *2.

22

cases for trial.'"[65]  Generally, the work product doctrine exists to preserve and promote the adversarial system of litigation and prevent a party from free-riding on his opponent's efforts.[66]  In those instances where a claim cannot proceed without third-party financing, one element of preparing a client's case for trial will be securing the requisite funding, which probably will require discussions of a case's merits in an effort to convince the third party to supply the needed funds.  No persuasive reason has been advanced in this case why litigants should lose work product protection simply because they lack the financial means to press their claims on their own dime.  Allowing work product protection for documents and communications relating to third-party funding places those parties that require outside funding on the same footing as those who do not and maintains a level playing field among adversaries in litigation.  Thus, even though claim funding is the business of financing lawsuits, which means the Discovery Documents serve a business purpose, those documents simultaneously also are litigation documents and work product protection is appropriate.

## 2.	The applicable law

In the event of a conflict between the privilege law of this forum and that of Guernsey, the *Restatement (Second) Conflict of Laws* directs that:

---

[65]	*Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 260 (Del. 1995) (quoting *Riggs Nat'l Bank of Wash. D.C. v. Zimmer*, 355 A.2d 709, 715 (Del. Ch. 1976)).

[66]	*Id.*

23

> Evidence that is not privileged under the local law of the state which has the most significant relationship with the communication will be admitted, even though it would be privileged under the local law of the forum, unless the admission of such evidence would be contrary to the strong public policy of the forum.[67]

I consider next, therefore, whether a conflict exists between Delaware and Guernsey law.

Under Delaware law, the Discovery Documents are entitled to work product protection. Guernsey law probably does not find litigation privilege applicable to the Discovery Documents, but Guernsey law might protect at least parts of those documents under theories of legal advice privilege. This conclusion about Guernsey law, however, is based almost entirely on one case from England. The Court is aware of no Guernsey cases on point. In addition, the Liquidators cited to contrary Australian authorities that would find litigation privilege applicable to these disputed documents, and there also is the issue of the conflicting English authorities on ATE policies. In sum, it is unclear whether the Discovery Documents would be privileged under Guernsey law. Thus, I am not convinced that there is a conflict between Delaware and Guernsey law. Accordingly, the first condition of the *Restatement* is not clearly satisfied and the *Restatement*'s guidance, therefore, is not determinative here.

Before this Memorandum Opinion, neither Delaware nor Guernsey squarely had addressed whether third-party funding agreements and related documents deserve work product protection. In these circumstances, the *Tyson Foods* approach seems preferable:

---

[67] *Restatement (Second) Conflict of Laws* § 139(1) (West 2014).

24

"Since neither jurisdiction has decided the issue using its own laws, the Court will not read a conflict where none exists and will apply the law of the forum state, Delaware."[68]

I conclude that Delaware law governs this discovery dispute. Under Delaware law, the Discovery Documents are entitled to work product protection.

### D.     Has Privilege Been Waived?

Plaintiffs opposed the Liquidators' intervention and also argued against any protective order. Plaintiffs' briefing focused primarily on issues of timeliness, what occurred in the Guernsey Litigation proceedings, whether the Liquidators previously acted inequitably before this Court, and whether the Discovery Documents are privileged. Comparatively little briefing addressed the issue of waiver. In that regard, Plaintiffs' chief argument is that the Liquidators unduly delayed in seeking a protective order and thereby waived any applicable privilege. In Section II.B *supra*, I rejected Plaintiffs' arguments that the Liquidators' delay made their motion to intervene untimely and should prevent them from pursuing their privilege arguments. That same analysis applies here: the Liquidators were not so dilatory as to warrant the harsh result of waiver on grounds of timeliness alone, particularly given that this case is stayed.

Plaintiffs also urged the denial of any privilege claims because Defendants and the Liquidators had not substantiated such claims by providing an appropriate privilege log. Such a log was not produced until November 2014, after the main briefing and the Argument. Based on the complexity of the threshold issues regarding the nature of the

---

[68]     *Tyson Foods*, 2011 WL 3926195, at *6.

claimed privileges under Delaware and Guernsey law, I find the belated timing of the log is excusable. Should Plaintiffs wish to challenge the adequacy of specific entries on that privilege log or the log in general, they are free to do so in the future.

## E. Unresolved Issues

In this Memorandum Opinion, I have determined that the Liquidators should be permitted to intervene, that Delaware law governs this discovery dispute, that the Discovery Documents are protected by work product privilege, and that there has been no waiver of work product privilege based on the Liquidators' purportedly untimely assertion of claims of privilege. At the Argument, I also required Defendants to produce certain limited discovery and indicated that most of that could be disclosed only to Plaintiffs' counsel who are not involved in the Guernsey matter. In their November 10, 2014 Compliance Statement, Defendants summarized their responsive actions as follows:

> 1) the redacted funding agreement and its associated redaction log have been produced to Morris Nichols; 2) all records within Defendants' possession, custody or control have been searched for responsive documents; 3) all potentially responsive documents have been individually identified on the privilege log produced to Morris Nichols; and 4) the categories of documents logged and the bases for the privilege and confidentiality claims asserted have been provided to both Morris Nichols and Williams & Connolly.[69]

This Memorandum Opinion is without prejudice to Plaintiffs' ability to pursue production of the Discovery Documents on grounds not addressed herein. In that regard, I provide the following comments as to the nature of certain issues that may remain open.

---

[69] Compliance Statement 4.

26

First, I reiterate that this case is stayed. Only discovery going to the issue of personal jurisdiction currently is permitted. This discovery dispute, however, either has strayed or is at risk of straying from that narrow area of allowable discovery into discovery on the merits. According to the Compliance Statement, the currently withheld documents relate to the negotiation of the funding agreement.[70] For purposes of this Memorandum Opinion, I have not had to address the issue of whether the 92 Discovery Documents actually relate to personal jurisdiction or otherwise are responsive to the non-stayed discovery in this case. Those issues have not yet crystallized.

Second, the issue of waiver has been addressed only in terms of the Liquidators' timeliness in asserting their privilege claims. Waiver also may occur because of an inadequate privilege log. Because of the unusual procedural posture of this case, Plaintiffs have not had a fair opportunity to challenge the adequacy of the privilege log produced by Defendants. A seriously deficient privilege log—*e.g.*, one containing descriptions that are substantially misleading, incomplete, or inaccurate—can result in wholesale waiver of the documents covered by the log. This Memorandum Opinion is without prejudice to any challenge Plaintiffs may make to the adequacy of the privilege log.

---

[70] Defendants have represented in their Compliance Statement that the relationship between the Liquidators and Defendants' sponsoring affiliate is governed entirely by the funding agreement. The parties dispute, therefore, whether the remaining Discovery Documents could show an agency or control relationship between Defendants and the Liquidators, which is the theory upon which Plaintiffs claim that Defendants are subject to this Court's jurisdiction.

Third, assuming no waiver, work product protection still provides only a qualified immunity from discovery. To obtain the Discovery Documents, Plaintiffs must demonstrate "substantial need of the materials in the preparation of [their] case and that [they are] unable without undue hardship to obtain the substantial equivalent of the materials by other means."[71] Almost none of the briefing directly addressed this issue. Accordingly, I express no opinion on it. Plaintiffs are not precluded from arguing in the future that they have a substantial need for one or more of the Discovery Documents sufficient to outweigh the work product privilege.

Fourth, I consider it appropriate to modify somewhat the restrictions Defendants imposed on the access of Plaintiffs' attorneys to the few documents Defendants have produced. Plaintiffs have a right to counsel of their choice, but there also are serious concerns about granting Williams & Connolly access to the redacted funding agreement and other items that have been produced to date only to Plaintiffs' Morris Nichols attorneys because of Williams & Connolly's involvement in the Guernsey Litigation. To facilitate the review of the redacted funding agreement and the redaction and privilege logs that have been produced and the determination of what additional action, if any, Plaintiffs should take regarding them, I conclude that it is appropriate to authorize up to two attorneys from Williams & Connolly to have access to those documents. But, all of the Williams & Connolly attorneys who are of record in this case evidently also are involved to some degree in the Guernsey Litigation. Assuming that is true, I have

---

[71] Ct. Ch. R. 26(b)(3).

28

determined to allow Plaintiffs to designate up to two other Williams & Connolly attorneys, who have not had any direct or indirect involvement in the Guernsey Litigation, to have access to the redacted funding agreement, the redaction log, and the privilege log, contingent on their complying with the conditions set forth in more detail in the Order accompanying this Memorandum Opinion.

## III.    CONCLUSION

For the foregoing reasons, the Liquidators' motion to intervene is granted, and the motion for a protective order is granted to the extent indicated in this Memorandum Opinion. These rulings are memorialized in the implementing Order being entered on this same date, and are without prejudice to Plaintiffs' ability to renew their motion to compel and pursue the issues not resolved herein.