IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PAMELA FORD, | : | |
| | : | |
| Plaintiff, | : | C.A. No. K19C-12-030 JJC |
| | : | In and for Kent County |
| v. | : | |
| | : | |
| SEDGWICK CLAIMS | : | |
| MANAGEMENT SERVICES, | : | |
| INC., and LOWE'S HOME | : | |
| CENTERS, INC., | : | |
| Defendants. | : | |

**OPINION AND ORDER**

Submitted: April 7, 2020
Decided: May 20, 2020

*Defendants' Motion for Summary Judgment – GRANTED*

John S. Spadaro, Esquire, John Sheehan Spadaro, LLC, Smyrna, Delaware, *Attorney for Plaintiff*.

David C. Malatesta, Esquire, Kent & McBride, P.C., Wilmington, Delaware, *Attorney for Defendants*.

**Clark, J.**

Defendants Sedgwick Claims Management Services, Inc. and Lowe's Home Centers, Inc. (hereinafter collectively "Sedgwick") seek summary judgment in this insurance bad faith suit. Sedgwick argues that Plaintiff Pamela Ford's suit should be dismissed because it violates the rule against claim splitting. Ms. Ford had previously filed a suit seeking unpaid bills, interest, and attorneys' fees pursuant to *Huffman v. C.C. Oliphant & Son, Inc.*.[1] She settled that claim one year after she filed it. Approximately three weeks later, she filed this bad faith action. Because Ms. Ford's *Huffman* claim and bad faith claim involve the same nucleus of facts and the same transaction, the doctrine of claim preclusion prevents her from pursuing her bad faith claim. As a result, Sedgwick's motion for summary judgment must be **GRANTED**.

### Procedural Background and Facts of Record

The facts are those of record, viewed in the light most favorable to Ms. Ford, the non-movant. Ms. Ford suffered a work-related injury on May 26, 2015 at Lowe's. Sedgwick's role relevant to this action included the processing and payment of medical expenses related to her injury. On April 11, 2017, Ms. Ford filed a petition seeking outstanding medical expenses from Sedgwick. On September 26, 2017, the parties settled that claim. In the agreement, Sedgwick accepted responsibility for the medical expenses. Notwithstanding the settlement, Sedgwick did not pay them for more than two years.

Over the first year following the settlement, Ms. Ford's attorney contacted Sedgwick three times seeking payment. Her attorney first wrote Sedgwick on November 24, 2017, requesting payment verification.[2] Her attorney sent another

---

[1] 432 A.2d 1207 (Del. 1981).
[2] Def. Mot., Ex. 1, at 3.

letter on December 5, 2017, again requesting payment verification.[3] On March 27, 2018, Ms. Ford's attorney sent Sedgwick a third letter. It confirmed Sedgwick's agreement to pay.[4]

Approximately one year after the September 2017 settlement, however, Sedgwick had still not paid Ms. Ford's bills. At that point, on September 13, 2018, Ms. Ford's attorney sent Sedgwick a *Huffman* demand pursuant to 19 *Del. C.* §§ 2357, 1103, and 1113.[5] Following Sedgwick's failure to pay within thirty days of the demand, Ms. Ford filed suit in Superior Court on October 17, 2018. In her complaint, she sought her medical expenses, interest due on those bills, attorneys' fees, and costs.[6]

A full year later, Sedgwick had still not paid the benefits. The parties then settled the claims in her *Huffman* suit and on November 21, 2019, Ms. Ford signed the release.[7] The court then dismissed that case with prejudice on December 6, 2019.[8] Approximately three weeks later, Ms. Ford filed the current suit. In it, she claims that because Sedgwick failed to pay the medical expenses claimed in the *Huffman* action, it acted in bad faith.[9] Specifically, the new suit focuses on an alleged lack of reasonable justification for Sedgwick's "prolonged and repeated failure" to pay the same medical expenses that were at issue in the *Huffman* claim.

After Ms. Ford filed the second complaint, Sedgwick moved to dismiss it pursuant to Superior Court Civil Rule 12(b)(6). Because the parties referenced matters outside the pleadings, the Court converted the motion to one for summary judgment.

---

[3] *Id.* at 4.
[4] *Id.* at 5.
[5] *Id.* at 6.
[6] *Id.* at 1.
[7] Def. Mot., Ex. 2, at 1.
[8] Def. Mot., Ex. 3, at 1.
[9] Pl. Compl., ¶¶ 9–19.

## Parties' Arguments

Sedgwick argues that Ms. Ford's failure to raise the bad faith claim in her first suit precludes her from raising it in her second pursuant to the rule against claim splitting. Namely, Sedgwick argues that she could have—and should have— raised any bad faith claims in the first action. Sedgwick argues that both the *Huffman* and bad faith claims arise out of the same transaction. This, in turn it argues, triggers the rule against claim splitting. Finally, Sedgwick argues that because there was no jurisdictional or other impediment to raising the bad faith claim in the first suit, it is barred.

In response, Ms. Ford argues that the first action, a *Huffman* suit, and the present action do not arise out of the same transaction. Instead, she argues that for transactional purposes, a *Huffman* suit arises directly out of the initial workplace injury. On the other hand, she argues that a bad faith claim arises out of subsequent claims handling by the insurer. Given this difference, she argues that they are separate and distinct actions and need not be included in the same suit. In so arguing, she relies primarily upon the Superior Court decision in *Kelley v. ILC Dover, Inc.*[10] and the Delaware Supreme Court decision in *Pierce v. International Insurance Co.*[11] She also argues that public policy weighs against requiring a bad faith action to be included in a *Huffman* action. She asserts that to do so would inappropriately limit an insured's ability to pursue bad faith claims.

## Conversion to Motion for Summary Judgment

Sedgwick originally filed a motion to dismiss, pursuant to Superior Court Civil Rule 12(b)(6). When the Court examines a Rule 12(b)(6) motion, "[t]he complaint generally defines the universe of facts that the trial court may consider

---

[10] 787 A.2d 751 (Del. Super. Mar. 16, 2001) *aff'd*, 784 A.2d 1080 (Del. 2001).
[11] 671 A.2d 1361 (Del. 1996).

...."[12]  With only limited exceptions, if the Court looks outside the facts alleged in the complaint, it must not consider them or it must convert the motion into one for summary judgment.[13]  If the Court converts the motion, it must provide the parties a reasonable opportunity to expand the record.[14]

In its motion to dismiss, Sedgwick included documents as exhibits that Ms. Ford had not incorporated in the complaint.  They included (1) Ms. Ford's 2018 *Huffman* complaint and its accompanying exhibits, (2) the signed November 21, 2019 release settling the 2018 litigation, and (3) the December 6, 2019 stipulated order of dismissal that followed the release of the *Huffman* claim.  Ms. Ford referenced the same documents in her response to Sedgwick's motion to dismiss.  At oral argument, both parties also referred to them.  The Court recognizes that it could arguably take judicial notice of the pleadings filed in the prior *Huffman* action for Rule 12(b)(6) purposes.  Nevertheless, when the parties included the release as an exhibit, they expanded the record beyond the complaint.

Ms. Ford's claim narrowly focuses on Sedgwick's alleged bad faith when it failed to pay the medical bills at issue in the *Huffman* action.  Under the circumstances, and in light of the expansion of the record, the Court converted Sedgwick's motion to dismiss into a motion for summary judgment.  At that point, the Court notified the parties on March 5, 2020, and granted them leave until April

---

[12] *In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).
[13] *Id.*
[14] *Id. See also* Sup. Ct. Civ. R. 12(b) (providing "[i]f, on a motion asserting the defense numbered (6) to dismiss for failure of the pleadings to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56").

7, 2020 to supplement the record.[15]  Both parties filed supplemental arguments; neither supplemented the evidentiary record.

## Standard of Review

Given the conversion, the Court must apply the well-settled standard for summary judgment.  Summary judgment is appropriate only if there is no genuine issue of material fact and if the movant is entitled to judgment as a matter of law.[16]  The Court must view the evidence in the light most favorable to the non-moving party.[17]  The burden of proof is initially on the moving party.[18]  However, if the movant meets his or her initial burden, then the burden shifts to the non-moving party to demonstrate the existence of material issues of fact.[19]  The non-movant's evidence of material facts in dispute must be sufficient to withstand a motion for judgment as a matter of law and to support the verdict of a reasonable jury.[20]

## Claim Splitting and the Doctrine of Claim Preclusion

The rule against claim splitting is a subset of the doctrine of claim preclusion.[21]  Delaware applies the transactional approach.[22]  This approach considers a second lawsuit precluded if it arises from the same transaction as a

---

[15] *See Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1288 (Del. 2007) (recognizing "that the Superior Court must give the parties at least ten days' notice of its intent to convert a Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment").

[16] Super. Ct. Civ. R. 56(c); *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

[17] *Brozaka v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).

[18] Super. Ct. Civ. R. 56(e); *Moore*, 405 A.2d at 680 (Del. 1979).

[19] *Moore*, 405 A.2d at 681 (citing *Hurtt v. Goleburn*, 330 A.2d 134 (Del. 1974)).

[20] *Lum v. Anderson*, 2004 WL 772074, at *2 (Del. Super. Mar. 10, 2004).

[21] *Kossol v. Ashton Condominium Ass'n, Inc.*, 637 A.2d 827, 1994 WL 10861, at *2 (Del. 1994). (TABLE) (citing *Maldonado v. Flynn*, 417 A.2d 378, 382–83 (Del. Ch. May 29, 1980)).  The majority of existing case law examining this issue refers to the doctrine of *res judicata*.  The contemporary reference refers to claim preclusion.  The latter provides a better reference to examine claim splitting.

[22] *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 193 (Del. 2009).

previous adjudication.[23] Two claims that come from a common nucleus of facts arise from the same transaction.[24] If the plaintiff knows or could have known those common facts at the time of the first action, then the doctrine of claim preclusion bars the claim in the second action.[25] Under the transactional approach, resolving the first suit may bar a claim in the second, even if the plaintiff pursues a different substantive theory of recovery than in the first.[26]

This rule rests on the belief that it is fairer to require a plaintiff to present all his or her theories of recovery regarding one transaction in one suit. This prevents overlapping or repetitive actions at different times.[27] Accordingly, "where a plaintiff has had a 'full, free and untrammeled opportunity to present [his or her] facts,' but has [not, he or she] will ordinarily be precluded by the doctrine of [claim preclusion] from subsequently pressing [the] omitted claim in a subsequent action."[28]

To bar a plaintiff's second claim under the transactional approach, a defendant must establish two elements. First, the same transaction must form the basis for the prior and subsequent actions.[29] Second, the plaintiff must have not raised a claim in the first action that he or she should have, in fairness, raised.[30] If the *defendant* establishes these two elements, then the claim is barred unless the *plaintiff* demonstrates a legal impediment to bringing the claim in the first instance.[31]

---

[23] *Id.*
[24] *Id.* at 193.
[25] *Id.* (citation omitted).
[26] *Kossol*, 1994 WL 10861, at *2 (citations omitted).
[27] *Maldonado*, 417 A.2d at 382.
[28] *Id.* (citing *Coca Cola Co. v. Pepsi Co.*, 172 A. 260, 262 (Del. Super. Apr. 16, 1934)).
[29] *Id.*
[30] *Kossol*, 1994 WL 10861, at *2 (citing *Coca Cola*, 172 A. at 262).
[31] *Maldonado*, 417 A.2d at 382; *Kossol*, 1994 WL 10861, at *2 (citing *Maldonado*, 417 A.2d at 383–84).

**Both Claims Involved the Same Transaction**

In *LaPoint v. AmerisourceBergen Corp.*, the Delaware Supreme Court recognized three factors applicable to the first element of the two-part inquiry: whether the two claims arose from the same transaction. These three factors are (1) whether the facts relate in time, space, origin, or motivation, (2) whether they form a convenient trial unit, and (3) whether treating the claims as a unit meets the parties' expectations, business understanding, or usage.[32]

First, Ms. Ford's *Huffman* and bad faith claims relate in time, space, origin, *and* motivation. They center on Sedgwick's handling of the same claim. Moreover, the time-frames applicable to the two claims align exactly. Namely, after waiting a full year for Sedgwick to pay the bills, Ms. Ford filed her first suit on October 17, 2018. Her *Huffman* suit then remained active for more than a year, until early December 2019. The Court dismissed it after settlement. Ms. Ford filed her second suit three weeks later. As with the first suit, the second suit focuses on Sedgwick's failure to pay the same bills during the identical time-period at issue in the first suit.[33] Accordingly, the time relevant to the *Huffman* claim and the bad faith claim is identical in time and space. Likewise, the claims' origins are related. They both stem from Sedgwick's allegedly improper claims handling. Finally, and most telling, Ms. Ford's bad faith complaint alleges no additional bad faith after the settlement of the same claims addressed in the *Huffman* action.

As to motivation, both suits attack Sedgwick's claims handling and seek, at least in part, to impose a penalty. The *Huffman* action sought a remedy for failure to pay approximately $26,000 in medical expenses after a thirty-day demand period expired. In that action, Ms. Ford sought the statutory penalty for Sedgwick's failure to pay – attorneys' fees. Likewise, the bad faith action, though a different theory of

---

[32] *LaPoint*, 970 A.2d at 193 (citing Restatement (Second) of Judgments § 24(2) (1982)).
[33] Pl. Compl. ¶ 13.

recovery, seeks to punish Sedgwick for not paying the same benefits. Specifically, Ms. Ford's second suit alleges a bad faith breach of contract based upon the "defendants' handling of Ms. Ford's claims for workers' compensation benefits."[34] In doing so, it seeks both "compensatory and punitive damages."[35] Both suits have substantially similar motivations in that they both seek penalties because Sedgwick wrongfully withheld the same benefits.

As to the second *LaPoint* factor, Ms. Ford's *Huffman* and bad faith claims would have formed a convenient trial unit. She argues that they would not because they have different state of mind requirements. She correctly emphasizes that in a *Huffman* suit, the insurer's state of mind is irrelevant.[36] In contrast, in a bad faith claim, the fact finder must evaluate the insurer's state of mind to determine if it was reckless or worse.[37] Based on these state of mind differences, Ms. Ford argues that filing *Huffman* actions and bad faith claims together would result in unnecessary work, expense, and confusion. Namely, she argues that combining them would require more extensive discovery, trial preparation, and a complicated explanation to the jury.

In this regard, Ms. Ford's argument is not persuasive. Many, if not most, actions include claims with different theories of recovery and different state of mind requirements. Coupling a claim that has no state of mind requirement with one that does is an ordinary thing in civil practice. Rather than adopt Ms. Ford's suggested approach focusing narrowly on states of mind, the Court must consider the overall

---

[34] Pl Compl. ¶ 1.

[35] *Id.*

[36] *See Huffman*, 432 A.2d at 1209 (explaining that an employer or insurer's good faith belief that an employee is not entitled to compensation is irrelevant under the applicable statute because only the Board can make such a determination and payment should continue until any such determination is made).

[37] *See Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 529 (Del. 1987) (summarizing the states of mind justifying punitive damages). *See also Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 264 (Del. 1995) (applying the punitive damages state of mind framework in the insurance context).

evidentiary overlap between the two claims.[38] Namely, it must consider the degree that witnesses or proofs in a second action would tend to overlap with the first.[39] Where the two substantially overlap, the second action is more likely precluded.[40]

Here, there is significant, if not complete, overlap between the two claims. The two years between the 2017 settlement agreement and the 2019 *Huffman* suit's settlement is the relevant claims handling period for both claims. The identical claims adjuster and medical providers testimony would be necessary to prove both claims, including (1) the presentation of bills, (2) settlement of the IAB claim, (3) the terms of the settlement, (4) Ms. Ford's demand for payment thereafter, and (5) Sedgwick's failure to pay despite demand. As a result, there is a substantial overlap in witnesses and proof between the two claims.

Considering the third *LaPoint* factor—whether treating the *Huffman* suit and bad faith claim as a unit conforms to the parties' expectations or business understanding or usage -- turns on many of the same undisputed facts. Claims handling is claim handling and parties generally understand it to be so. In a lawsuit, parties typically assert all relevant claims available against an opposing party.[41] Exceptions apply, such as where individual obligations create successive obligations that may require separate actions.[42] Even where successive obligations arise between the same parties, the doctrine of claim preclusion may still require the

---

[38] Restatement (Second) of Judgments § 24, cmt. b.

[39] *Id.*

[40] *Id.*

[41] *See* Super. Ct. Civ. R. 18 (permitting "a party asserting a claim to relief as an original claim, counterclaim, cross-claim, or third-party claim, [to] join, either as independent or as alternate claims, as many claims as the party has against an opposing party").

[42] Restatement (Second) of Judgments § 24, cmt. d. (providing an example of separate successive actions, such as where "there is an undertaking, for which the whole consideration has been previously given, to make a series of payments of money . . . the obligation to make each payment is considered separate from the others and judgment can be obtained on any one or a number of them without affecting the right to maintain an action on the others").

plaintiff to raise the claims in the same suit.[43]  This case does not require the more complicated analysis required in such cases.  Rather, it involves one distinct claims handling period as opposed to successive ones.

In this decision, the Court recognizes that evaluating bad faith in claims handling often requires a cumulative evaluation of an insurer's conduct.  Bad conduct may not tip the threshold to qualify as bad faith until a certain point in the process.  Furthermore, the Court recognizes that given the length of some workers' compensation claims, a claim may run smoothly for a time and then generate a later dispute between the parties.

Here, however, the entire relevant universe of facts for both claims fell within the same clearly defined time.  If Ms. Ford wanted to sue Sedgwick for bad faith for its conduct during this time, she (1) should have raised it in her first complaint, or (2) sought to amend the first complaint to include it before settling the first action.  Based upon the *LaPoint* factors, Ms. Ford's 2018 *Huffman* suit and bad faith claim arise out of the same transaction.

### Fairness in Including It in the First Suit

Before applying claim preclusion in this instance, the Court must also examine the second element in the inquiry: whether Ms. Ford, should have in fairness, included her bad faith claim in the first suit.[44]  Here, she should have for the same reasons discussed in the Court's *LaPoint* factors analysis.  Namely, she did not settle the first suit until a full year after filing it.  This gave her sufficient time to fully litigate any claims related to Sedgwick's then two-year withholding of

---

[43] *Id.* (describing the concept of successive or simultaneous acts of a defendant within the general rule of claim splitting).

[44] *Kossol*, 1994 WL 10861, at *2

benefits.[45] This period also permitted her sufficient time to move to amend the first complaint. Permitting Ms. Ford to proceed with her bad faith claim now would provide overlapping and repetitive prosecutions. The rule against claim splitting avoids those ills.[46] As a result, Ms. Ford failed to assert a bad faith claim that she should have in fairness asserted in her 2018 *Huffman* suit.

### No Impediment to Having Joined the Two Claims

Finally, Sedgwick has established that (1) the same transaction forms the basis for Ms. Ford's prior and present suit, and (2) in fairness, she should have asserted her bad faith claim in the first suit. Accordingly, Ms. Ford's bad faith claim survives only if there was an impediment to the presentation of her claim in the prior action. Here, she identifies no such impediment; nor has the Court found one. Pursuant to 19 *Del. C.* § 1113(a), Ms. Ford filed her 2018 *Huffman* suit in Superior Court.[47] As with her *Huffman* suit, the Superior Court had jurisdiction to address her bad faith claim so there was no jurisdictional impediment. Likewise, no statutory or common-law prohibition prevented her from including the claim in her first suit.

Ms. Ford asks the Court to bypass the *LaPoint* factors in its analysis because she claims that, as a matter of law, *Huffman* suits and bad faith claims arise out of separate transactions. Although she does not couch her argument in terms of a legal impediment to combining the claims, her argument is best resolved in that manner.

She bases her argument on the Superior Court's decision in *Kelley v. ILC Dover, Inc.*,[48] and the Delaware Supreme Court's decision in *Pierce v. International*

---

[45] *Id.* at *3 (explaining that "[a] fundamental tenet of the adversarial process is the opportunity of both parties to fully litigate the claims implicated in their dispute").

[46] *Maldonado*, 417 A.2d at 382.

[47] 19 *Del. C.* § 1113(a) (providing that "[a] civil action to recover unpaid wages and liquidated damages may be maintained in any court of competent jurisdiction").

[48] 787 A.2d 751 (Del. Super. Mar. 16, 2001).

*Insurance Co.*[49]   Ms. Ford claims these decisions collectively provide that a bad faith claim need not be included in any *Huffman* suit.   According to her, the *Kelley* decision recognizes that *Huffman* suits are intended to "pry loose" unpaid workers' compensation benefits.[50]   Because a *Huffman* claim seeks unpaid benefits due because of a workplace accident, she argues that a *Huffman* claim arises from the accident rather than subsequent claims handling.   She further emphasizes that the *Pierce* decision recognizes that bad faith claims arise from claims handling that occurred *after* the workplace accident.[51]   That, she asserts, makes the two claims different and the later not subject to preclusion.   In this regard, she argues that her two claims arose out of separate transactions as a matter of law.

Neither the *Kelley* nor the *Pierce* decision support Ms. Ford's arguments.   In fact, together they illustrate why there was no impediment to including the two claims in the first suit.   First, nothing in the *Kelley* decision provides that *Huffman* suits derive, as a matter of law, from the original accident.   Rather, it addressed claims handling and the demand necessary to trigger the Superior Court remedy.[52] Otherwise, the *Kelley* decision mentions nothing, in terms of transactional matters, about the basis for a *Huffman* suit.   To the contrary, the *Kelley* decision impliedly recognizes that a *Huffman* claim arises from the employer or insurer's failure to pay benefits upon demand.[53]   Failure to pay benefits is a function of claims handling.   It is not an event that can be considered one in the same as the original workplace injury.

---

[49] 671 A.2d 1361 (Del. 1996).
[50] *See* Pl. Resp. at 4–5 (quoting *Kelley* to show that Sections 2357 and 1113(a) "include claims based on unpaid workers' compensation benefits").
[51] *Pierce*, 671 A.2d at 1365.
[52] *Kelley*, 787 A.2d at 753–54.
[53] *Id.* (citations omitted) (emphasis omitted).

Likewise, the Supreme Court's *Pierce* decision further demonstrates that the claims are more similar than dissimilar. Namely, in *Pierce*, the plaintiff filed a bad faith claim after an employer delayed paying disability benefits for eleven-months.[54] The plaintiff appealed the Superior Court's dismissal of his claim on the basis that workers' compensation exclusivity barred the plaintiff from filing his bad faith claim in Superior Court.[55] In that decision, the Superior Court found the original work injury to subsume the bad faith claim.

In reversing the Superior Court's decision, the Delaware Supreme Court held that exclusivity did not bar the plaintiff's claim. It recognized that bad faith adjustment centers on conduct *after* the workplace accident.[56] The Court also recognized the distinct temporal difference between a workplace accident and subsequent claims handling related to the accident.[57]

Accordingly, a *Huffman* action arises only after there is a failure to pay benefits and a demand. Similarly, a bad faith action arises only after there is a bad faith delay or failure to pay benefits. Both focus upon claims handling. Under the circumstances of this case, these two claims should have been included in the same suit.

Finally, the Court need not address Ms. Ford's public policy argument regarding an improper chilling effect on bad faith litigation. The Court's role in this instance is not to address public policy. Rather, it is to apply well-recognized concepts of civil procedure. Although Ms. Ford's claim is barred under the circumstances of this case, the Court does not hold that a bad faith claim can never separately follow a *Huffman* action. To do so would ignore the possibility that bad

---

[54] *Pierce*, 671 A.2d at 1362.
[55] *Id.* at 1363.
[56] *Id.* at 1365.
[57] *Id.*

faith could follow the resolution of a *Huffman* suit. Under the circumstances of this case, however, there was a complete overlap of relevant insurer conduct between the two claims. Ms. Ford should have, in fairness, included her bad faith claim in the first suit.

### Conclusion

When viewing the facts in the light most favorable to Ms. Ford, and recognizing that there are no genuine issues of material fact regarding whether the same transaction forms the basis for both the 2018 litigation and the present action, summary judgment on behalf of Defendant Sedgwick Claims Management Services, Inc., and Lowe's Home Centers Inc., must be **GRANTED**.

**IT IS SO ORDERED.**

/s/Jeffrey J Clark
Judge
